[Crim. No. 23440. July 25, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
HAROLD JOHN BABYLON et al., Defendants and Appellants.

**Counsel**

Thomas W. Bell, Jr., Jed Scully and James R. Browning for Defendants and Appellants.

John A. Dougherty, District Attorney, and George M. Hendrickson, Deputy District Attorney, for Plaintiff and Respondent.

**Opinion**

**KAUS, J.**—Alarmed by the increasing "piracy" of over-the-air subscription television transmissions and the threat it poses to a burgeoning new industry, the Legislature, in 1980, enacted a protective measure, codified as Penal Code section 593e. As originally enacted, section 593e provided in pertinent part that "[e]very person who for profit knowingly and willfully manufactures, distributes, or sells any device . . . with the purpose or intention of facilitating interception or decoding of any over-the-air transmission by a subscription television service made pursuant to authority granted by the Federal Communications Commission which is not authorized by the subscription television service is guilty of a misdemeanor . . . ."

Following a court trial in Sacramento Municipal Court, defendants Babylon and Hyatt were found guilty of violating section 593e. The appellate department of the superior court reversed, finding section 593e unconstitutionally vague and overbroad as applied to these defendants. The case was then certified to the Court of Appeal pursuant to rule 62 of the California Rules of Court. We granted a hearing after the decision of the Court of Appeal.

Originally this appeal confronted the courts with the challenge of interpreting and applying section 593e as enacted in 1980. During the pendency of this appeal, however, the Legislature amended section 593e,[1] and—what-

---

[1]Section 593e was considerably revised and expanded by Senate Bill No. 387, which was approved by the Governor on July 10, 1984. (Stats. 1984, ch. 336.) Unless otherwise indicated, all subsequent references to section 593e are to the amended statute.

ever may have been the case with respect to the 1980 legislation—it appears that the amended provision does not proscribe the activities of these defendants. Thus, pursuant to the general principle that, absent a saving clause, a criminal defendant is entitled to the benefit of a change in the law during the pendency of his appeal (*People* v. *Rossi* (1976) 18 Cal.3d 295 [134 Cal.Rptr. 64, 555 P.2d 1313]; *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948]), we conclude that the recent amendment requires reversal of the convictions.

I[2]

Only two types of entities in the United States are licensed to transmit television program material "over the air." The transmissions of each may consist of commercial programming or of what is commonly referred to as "subscription television."

The most common of these two licensed entities is the commercial television broadcast station, which is authorized by the Federal Communications Commission (FCC) to transmit only on VHF and UHF frequency bands.[3] FCC rules and regulations do, however, allow a licensed commercial television broadcast station to transmit "subscription television service" in addition to the other television program material which, as a licensee, it is required to transmit.[4]

The other type of entity is licensed by the FCC as a common carrier and is referred to by the FCC as a Multipoint Distribution Service (MDS). This common carrier entity is allowed to transmit only on the frequency band of 2150 to 2162 MHz.[5]

---

[2]Our summary of the facts in this case is based upon the parties' "Consolidated Statement of Facts (Evidence) in Lieu of Testimony at Court Trial."

[3]I.e., VHF channels 2 to 13 (54 to 216 MHz) and UHF channels 14 to 83 (470 to 890 MHz).

[4]See 47 Code of Federal Regulations, sections 73.642, 73.643, 73.644.

[5]As in the case of a licensed commercial television broadcast station, a licensed MDS common carrier who transmits television program material is subject to FCC regulation. (See 47 C.F.R. § 21.900 et seq.)

MDS uses microwave radio frequencies in the 2150-2162 MHz range with omnidirectional propagation characteristics to transmit signals either directly to receivers or to other types of distribution systems.

The FCC originally allocated the 2150-2160 MHz band for omnidirectional microwave use in its *Report and Order in Docket No. 14712* (1962) 39 F.C.C. 834. In its *Notice of Proposed Rule Making in Docket No. 19493* (1972) 3 F.C.C.2d 616, the FCC initiated rule making for MDS. Current rules designate 2150-2156 MHz as channel 1 and 2156-2162 MHz as channel 2. Though not usually referred to as MDS, frequencies in the 2596-2644 MHz band are also assigned to fixed stations in multipoint distribution service. These frequencies are shared with Instructional Television Fixed Service stations licensed under part 74 of the FCC's rules. (47 C.F.R. § 21.901(a).)

Defendants are accused of selling devices to be used for the unauthorized reception of an over-the-air transmission broadcast by Sacramento Microband (Microband), a licensed MDS. Microband leases space for its microwave antenna on a tower near Sacramento. Utilizing this antenna and a transmitter, Microband transmits Home Box Office (HBO) program material, of which California Satellite Systems (CALSAT) is the exclusive Sacramento area franchisee.

CALSAT, a California corporation which holds no license or permit from the FCC, charges each member of the public who wishes to receive HBO program material an installation fee and a monthly fee for the receipt and personal use of HBO programs. It uses a subsidiary as the installer of the microwave antenna, standard amateur down converter, power supply, antenna mast, and other items considered necessary for the individual's reception of HBO programs. The individual subscriber buys some of the equipment from CALSAT, but leases the microwave antenna, the amateur down converter, and the power supply.

Originating in New York, HBO program material is transmitted to a satellite and is received by Satellite Networks Incorporated (SNI), an FCC licensed common carrier located near Rancho Cordova, California. SNI, in turn, transmits HBO material to Microband's receiver/transmitter tower facility. Microband then transmits this material omnidirectionally—that is, on a 360 degree basis, as opposed to a point-to-point basis. CALSAT pays Microband a fee for this over-the-air transmission.

During the period relevant to this case, Microband also transmitted program material which originated in Atlanta, Georgia, on channel 17—commonly known as "Ted Turner's Super Station," WTVS. Unlike HBO, this material contained commercials.

In 1982 there were about 20 varieties of "dish"-type *microwave antennae* on the market. All received the frequency band of 2150 to 6215 MHz, which—as noted—includes the band on which the HBO material is broadcast. The *standard amateur tuneable down converter* used by CALSAT has been available on the open market for some 20 years and CALSAT has used at least 8 different manufacturers of down converters as sources for the converter it leases to its customers. All of these converters receive transmissions in the frequency band of 2000 MHz to 2700 MHz and "down convert" (reduce) these transmissions to the frequency of 54 MHz to 890 MHz, which is then down converted further by the television set itself into an intelligible signal. Finally, the *power supply* which CALSAT leases to its customers is simply a device capable of transforming household current

into the type of current necessary to operate the down converter; indeed, a 12-volt battery would suffice as a power supply.

On December 10, 1980, Investigator Dodd attempted to purchase an "HBO system" from defendant Babylon. Babylon told her that he was not allowed to sell the system for HBO use and that if she told him she was going to use it for HBO, he would not sell it to her. He added that there was no law against her owning or using it. When asked what other programs the system would receive, Babylon replied that the only signal received by the system "around here" was HBO. After explaining and demonstrating the system, Babylon sold her the dish antenna, the amateur down converter, and the power supply for $190.75. Dodd then informed Babylon that she was from the district attorney's office, at which point Investigator Sihner entered the store and issued Babylon a citation for violation of Penal Code section 593e. Sihner had been in the store the day before. Babylon had refused to sell him the "system," stating that if Sihner told him he was going to use it for HBO, he would not sell it to him.

On December 15, 1980, investigators purchased from defendant Hyatt the following items: a down converter, dish antenna, cozx cable, brackets, transformers and a power supply unit. The $320 purchase included a pamphlet entitled "microwave antennas accessories earth stations." At the site of the proposed installation, Hyatt advised the investigators that the equipment—as he proposed to install it—would receive HBO when the antenna was pointed in a certain direction and that receiving HBO was the intended use of the "system."

Both Babylon and Hyatt have stipulated that they knew at the time of the sales that the equipment was capable of receiving the "HBO program material" transmitted by Microband, that it was going to be used for that purpose, and that they did not have the consent of CALSAT to sell the equipment to their customers for profit.

We should note, also, that the "scrambling" or "encoding" of MDS signals is authorized by 47 Code of Federal Regulations, section 21.907(e). Because a "decoder" is required to render such signals intelligible, encoding provides increased protection from unauthorized interception and use. The transmission at issue in this case was *not* encoded. Babylon and Hyatt are *not* accused of selling the decoders or "descramblers" which are sold by many dealers. Penal Code section 593e—old and new—clearly prohibits the unauthorized manufacture, distribution, and sale of such decoders. The antennae and standard amateur down converters involved in this case merely *receive* and *reduce* microwave transmissions—they do not decode or unscramble the signals. In effect, we are being asked to decide whether the

language of section 593e is broad enough to extend beyond the obviously targeted decoders to encompass devices which merely receive microwave transmissions.[6]

## II

■ Defendants argue that the now superseded Penal Code section 593e is, as applied to them, vague, ambiguous, and overbroad. They also challenge it on the theory that it is preempted by the Federal Communications Act of 1934 (47 U.S.C. ch. 5, §§ 151-610). We need not address questions concerning the proper construction of former section 593e, as we have concluded that the amended statute does not proscribe the defendants' activities in this case. Thus, even if it were assumed that these activities did constitute a violation of former section 593e, as already noted the judgment must be reversed under the well-established principle that, absent a saving clause, a defendant is entitled to the benefit of a more recent statute which mitigates the punishment for the offense or decriminalizes the conduct altogether. (*People* v. *Rossi, supra,* 18 Cal.3d 295; *In re Estrada, supra,* 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948]. See, also, *Governing Board* v. *Mann* (1977) 18 Cal.3d 819 [135 Cal.Rptr. 526, 558 P.2d 1].)

■ Representing a major revision and expansion of the old statute, the amended section 593e provides, in pertinent part, that "Every person who, without the express authorization of a subscription television system, knowingly and willfully . . . sells . . . or otherwise provides any device, any plan, or any kit for a device or for a printed circuit, designed in whole or in part to decode, descramble, intercept, or otherwise make intelligible *any encoded, scrambled, or other nonstandard signal carried by that subscription television system,* is guilty of a misdemeanor . . . ." (Pen. Code, § 593e, subd. (b), italics added.)

As already indicated, the transmission at issue was neither encoded nor scrambled. The People assert, however, that the transmission was "nonstandard" by virtue of the fact that it was broadcast on a microwave frequency. Defendants' liability under section 593e thus turns on the question of whether the MDS transmissions utilized a *nonstandard* signal. Unlike the old statute, amended section 593e provides definitions of key terms. Subdivision (g) states that "an encoded, scrambled, or other nonstandard signal shall include, without limitation, *any type of distorted signal or transmission* that is not intended to produce an intelligible program or service without

---

[6]Nor is this a case wherein a defendant has surreptitiously tapped into a privately owned or leased cable system. Cable television delivers its signal via a coaxial cable and is therefore not an "over-the-air transmission" service. Unauthorized interception of cable television is prohibited under Penal Code section 593d.

use of special devices or information provided by the sender for the receipt of such signal or transmission." (Italics added.)

Under this definition, HBO transmissions can be regarded as *nonstandard* only if they are *distorted.* Like encoding or scrambling, distorting a signal entails some form of alteration, modulation, or interference which prevents the reception of an intelligible program without the use of a special device or information provided by the sender. With respect to signal transmission systems, distortion generally involves a change in the form or shape of the wave—wave*form,* as distinct from wave*length.*[7] There is no evidence in this case that the sender of the MDS transmission varied the waveform in an effort to distort the signal.[8] The transmission was in no way altered, modified, or otherwise "distorted" so as to render it unintelligible. Any individual equipped with a microwave antenna and a standard amateur tuneable down converter—multipurpose devices which have been lawfully marketed for over 20 years—could receive this transmission in intelligible form without any special device or information provided by the sender.

The People contend that the MDS transmission was nonetheless "distorted" in that it could not be received in intelligible form by an ordinary television set—i.e., reception did require a microwave antenna and a down converter. Under this reasoning, of course, *any* microwave transmission—indeed, any transmission other than those in the 54-216MHz and 470-890MHz ranges of VHF and UHF channels (see fn. 2, *ante*)—would have to be regarded as "distorted." However, to suggest that a transmission is "distorted" merely by virtue of the sender's use of a particular frequency or frequency band would ignore both the plain and technical meanings of the word "distorted," for that language clearly implies that something must be done *to* the signal to render it "distorted." In effect, the People's argument boils down to the proposition that a *signal* is "nonstandard" if it cannot be received in intelligible form by a "standard" *television set.* This approach simply bypasses the requirement that a "nonstandard" *signal* be "distorted" and is in no way supported by the language of the statute.

---

[7]See, e.g., Smith, Glossary of Communications (1971) "(distortion" defined as "Any difference between the wave shape of an original signal, and the wave shape after the signal has traversed the transmission circuit"); Weik, Communications Standard Dictionary (1983) ("distortion" defined as "the amount by which an output waveform or pulse differs from the input waveform or pulse"); Pannett, Dictionary of Radio and Television (1967) ("distortion" defined as "dissimilarity in the waveform between the output and input of an amplifier"). See, generally, Ryder, Electronics Fundamentals and Applications (1975).

[8]Nor is there any evidence of the type of distortion known as "frequency distortion," defined in Communications Standard Dictionary, *supra,* as "[d]istortion that is caused by nonuniform attenuation or gain of the different frequencies in a signal." The record gives no indication of any use of nonproportional attenuation or variation in the transmission speed of different frequencies.

We note, also, that the use of microwaves in communications is by no means "nonstandard" in the sense of being rare or exotic. In addition to their role in radio technology, microwaves are frequently used in relaying telephone and television signals over long distances. Radar, military communications, and radio astronomy commonly utilize microwave transmissions. Microwaves—whether in communications or in a standard household microwave oven—have become a staple of modern American life.

In short, the MDS transmission at issue was neither encoded, scrambled, nor otherwise "distorted" so as to render it "nonstandard" as defined by the statute. Nor does the mere selection of a microwave frequency automatically result in a "nonstandard" transmission. Accordingly, we conclude that section 593e does not prohibit the sale of equipment designed merely to receive in intelligible form unencoded microwave transmissions broadcast by a multipoint distribution service.[9]

Although defendants were originally prosecuted under the 1980 statute, the 1984 amendments to section 593e contain no saving clause which might preserve prosecutions initiated under old section 593e. Therefore, it is unnecessary for us to address defendants' contentions regarding old section 593e. Regardless of what the outcome might have been under that statute, defendants are clearly entitled to the benefit of the amended statute, which was enacted during the pendency of this appeal. (*People* v. *Rossi, supra,* 18 Cal.3d 295, 301-302; *In re Estrada, supra,* 63 Cal.2d 740, 744-745. See also *Governing Board* v. *Mann* (1977) 18 Cal.3d 819 [135 Cal.Rptr. 526, 528 P.2d 1]; *People* v. *Benefield* (1977) 67 Cal.App.3d 51 [136 Cal.Rptr. 465].)[10] As we observed in *Rossi, supra,* the United States Supreme Court

---

[9]Our conclusion is not affected by section 593f, newly added to the Penal Code in 1984. Section 593f provides, in part: "Every person who for profit knowingly and willfully manufactures, distributes, or sells any device . . . with the purpose or intention of facilitating *decoding or addressing* of any over-the-air transmission by a Multi-point Distribution Service or Instructional Television Fixed Service made pursuant to authority granted by the [FCC] which is not authorized by the Multi-point Distribution Service or the Instructional Television Fixed Service is guilty of a misdemeanor . . . ." (Italics added.)

This section applies only to devices for decoding or addressing over-the-air transmissions of an MDS or Instructional Television Fixed Service. The equipment sold by defendants neither decoded nor addressed the MDS signals—it merely received and down converted them.

[10]This principle has long been a part of American common law. (See, e.g., *United States* v. *Schooner Peggy* (1801) 5 U.S. (1 Cranch) 103, 110 [2 L.Ed. 49, 51] (Marshall, C. J.).) *In re Estrada, supra,* involved an amendatory statute which mitigated the punishment for a crime. We reasoned that "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper. . . . It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (63 Cal.2d at p. 745.) In *Rossi, supra,* the intervening amendment entirely eliminated criminal sanctions

has stated that it is " 'the universal common-law rule that when the legislature repeals a criminal statute or otherwise removes the State's condemnation from conduct deemed criminal, this action requires the dismissal of a pending criminal proceeding charging such conduct. The rule applies to any such proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it.' " (18 Cal.3d at p. 304, quoting *Bell* v. *Maryland* (1964) 378 U.S. 226, 230 [12 L.Ed.2d 822, 826, 84 S.Ct. 1814].)

The judgment is reversed.

Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

---

for the defendant's acts, rather than merely reducing the punishment. We reasoned that the common law principles reiterated in *In re Estrada* apply a fortiori when criminal sanctions have been completely repealed before a criminal conviction becomes final. (18 Cal.3d at p. 301.)