[No. H000790. Sixth Dist. Mar. 21, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JOANNE ALEXANDER et al., Defendants and Appellants.

COUNSEL

Michael A. Kresser and James McNair Thompson, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

CHANG, J.*—

### ISSUE

Did the Legislature's inadvertent elimination of the sanctions against selling phencyclidine (PCP) cause a prosecution for such sales that had not yet reached final judgment to abate? As we explain, the answer is no.

### STATEMENT OF THE CASE

Defendants Gregory Pina and Joanne Alexander appeal from judgments entered after a court trial in which they were found guilty of possession for sale and sale of PCP (Health & Saf. Code, §§ 11378.5, 11379.5).[1]

### FACTS & PROCEDURAL HISTORY

On March 29 and again on April 2, 1984, undercover narcotics officers for the San Jose Police Department bought a bindle of PCP from defendants

---

*Assigned by the Chairperson of the Judicial Council.

[1]Unless otherwise specified, all references are to the Health and Safety Code.

at their residence. On April 28, police returned and arrested them. At that time, both defendants consented to an immediate search of the premises, during which police found 6 to 7 PCP cigarettes and 21 grams of PCP, with an estimated street value of $1800 to $2300.

In October a preliminary examination was held, and on November 5, 1984, defendants were arraigned in the Santa Clara County Superior Court on an information charging them with possession for sale and sale of PCP. Both defendants pleaded not guilty.

On January 24, 1985, defendants moved to dismiss the charges of selling PCP on grounds that recent amendments to the Health and Safety Code repealed the proscription against sale of PCP and, therefore, that the proceedings against them on those charges abated as a matter of law.

The trial court denied the motion. Thereafter, defendant Pina was convicted of two counts of selling PCP and defendant Alexander was convicted of one count of possession for sale and one count of selling PCP. Both defendants received two 3-year prison terms, one for each count. The terms were made concurrent with each other.

On appeal, defendants reiterate their claim that the proceedings against them for selling PCP abated and, therefore, that the trial court erred in denying their motion to dismiss these charges.[2]

## DISCUSSION

### I. STATUTORY & LEGISLATIVE BACKGROUND

#### A. *The California Uniform Controlled Substances Act*

We recount briefly the history of PCP regulation because it provides a valuable context within which to view the alleged "repeal" of the sanctions against selling PCP and helps explain our analysis and conclusion.

In 1972, the California Legislature passed the California Uniform Controlled Substances Act (the Act), section 11000 et seq., which provides a pervasive and unified system to regulate legitimate uses and control unlawful traffic in and the abuse of prescription and nonprescription drugs, certain chemical compounds, and organic substances. (Stats. 1972, ch. 1407, § 3,

---

[2]Defendant Alexander concedes the validity of her conviction for possession of PCP for sale.

p. 2987; see *Review of Selected 1972 California Legislation* (1973) 4 Pacific L.J. 211.) The Act comprised a new division 10 of the Health and Safety Code. In passing the Act, the Legislature repealed, inter alia, former division 10, which regulated "Narcotics" and division 10.5, which regulated "Restricted Dangerous Drugs." (Stats. 1972, ch. 1407, §§ 2, 4, pp. 2989, 3042; see generally, 40 West's Annot. Health & Saf. Code (1975 ed.), pp. 156, 179; see also *Review of Selected 1972 California Legislation* (1973) 4 Pacific L.J. 211, 382-383.) The new division 10 established a single, general category called "Controlled Substances," which was broken down into five separate lists or "schedules." (§§ 11054-11058.)[3]

For purposes of enumeration, the Act abandoned the distinction between "Narcotics" and "Restricted Dangerous Drugs" that had been embodied in former divisions 10 and 10.5. However, the Act indirectly maintained this distinction in setting forth the crimes involving controlled substances. Thus, article 1, chapter 6 of the Act (§§ 11350-11356) is headed "OFFENSES INVOLVING CONTROLLED SUBSTANCES FORMERLY CLASSIFIED AS NARCOTICS"; and article 5 (§§ 11376-11382.5) is headed "OFFENSES INVOLVING CONTROLLED SUBSTANCES FORMERLY CLASSIFIED AS RESTRICTED DANGEROUS DRUGS." The sections in article 1 incorporate those controlled substances that were formerly called "Narcotics" by specific cross-reference to the five schedules. Similarly, the sections in article 5 incorporate those controlled substances that were formerly called "Restricted Dangerous Drugs" by specific cross-reference. (See §§ 11350, 11351, 11352, 11353, 11355, 11377, 11378, 11378.5, 11379, 11379.5, 11380, 11380.5, 11382.) Both article 1 and article 5 contain sections that proscribe, among other things, possession, possession for sale, sale, use of minors by adults to commit proscribed acts, and sale of substances falsely represented as controlled substances. Read together, the two articles form a set of complementary statutes covering *all* controlled substances.[4]

## B. Regulation of PCP

In the original Act, the Legislature placed PCP on Schedule III, former section 11056, subdivision (b)(7). (See Stats. 1972, ch. 1407, § 3, p. 2994.) At that time, PCP offenses were included in the general statutes proscribing acts involving substances formerly called "Restricted Dangerous Drugs." (See former §§ 11377-11380 (Stats. 1972, ch. 1407, § 3, pp. 3021-3023, 3028).)

---

[3] Section 11007 defines "controlled substances" as those listed in the five schedules.

[4] The one exception is marijuana. Crimes involving marijuana are separately proscribed in article 2, sections 1157-1162.

However, in 1978, in apparent reaction to the reported devastating effects of PCP, the Legislature changed this arrangement of PCP and PCP offenses in the Act. (See *Review of Selected 1978 California Legislation* (1979) 10 Pacific L.J. 247, 406-407.) The Legislature took PCP off Schedule III and placed it in a new subdivision (e) to Schedule II, section 11055.[5] Besides repositioning PCP, the Legislature deleted PCP from the general statutes proscribing possession for sale and sale and added sections 11378.5 and 11379.5. These sections specifically proscribed possession for sale and sale of PCP and increased the punishment for these offenses from 2, 3, or 4 years to 3, 4, or 5 years in state prison.[6] (Stats. 1978, ch. 699, §§ 4, 5, pp. 2212-2213; cf. former §§ 11378 and 11379 (Stats. 1976, ch. 1035, § 4, p. 4635 and ch. 1139, § 83, p. 5084).)

At the same time, the Legislature increased the punishment for possession of certain precursors of PCP with intent to illegally manufacture PCP.[7] (See former § 11383 (Stats. 1978, ch. 699, § 8, p. 2213 and Stats. 1976, ch. 1116, § 2, p. 5015).)

In 1981, the Legislature expanded section 11055, subdivision (e), (Schedule II) to include not only PCP, but also certain specified analogs of PCP. (See former § 11055, subds. (e)(1)-(e)(3) (Stats. 1981, ch. 948, § 1, pp. 3619-3620).) The new subdivision also authorized the State Attorney General to add additional analogs to Schedule II.[8] (*Id.*)

---

[5]This subdivision (e) included: "[a]ny material, compound, mixture, or preparation which contains any quantity of phencyclidine having a potential for abuse associated with a depressant effect on the central nervous system." (See former § 11055, subd. (e), (Stats. 1978, ch. 699, § 1, p. 2210).)

[6]The Legislature also added section 11380.5 to specifically proscribe the use of a minor by an adult as an agent to commit PCP offenses or to furnish PCP to a minor. (Stats. 1978, ch. 699, § 6, p. 2213.)

[7]Possession of certain chemicals with intent to manufacture PCP was first proscribed in 1976. (Stats. 1976, ch. 1116, § 2, p. 5015; ch. 1139, § 86, p. 5085.)

[8]As amended in 1981, section 11055, subdivision (e), read as follows: "(e) Any material, compound, mixture, or preparation which contains any quantity of phencyclidine or the following analog or analogs determined by the Department of Justice to have a potential for abuse associated with a depressant effect on the central nervous system: [¶] (1) 1-(1-phencyclohexyl) pyrolidine. [¶] (2) 1-(1 2-thienyl) cyclohexyl) piperidine. [¶] (3) 1-(1-phenylcyclohexyl) morpholine. [¶] The Attorney General, or his or her designee, may, by rule or regulation, add additional analogs of phencyclidine to those enumerated in this subdivision after notice, posting, and hearing pursuant to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code. The Attorney General shall, in the calendar year of the regular session of the Legislature in which the rule or regulation is adopted, submit a draft of a proposed bill to each house of the Legislature which would incorporate the analogs into this code. No rule or regulation shall remain in effect beyond January 1st after the calendar year of the regular session in which the draft of the proposed bill is submitted to each house; unless the draft of the proposed bill is submitted during a recess of the Legislature exceeding 45 calendar days, in which event the rule or regulation shall be effective until January 1st after the next calendar year."

In 1982, the Legislature continued its attack on PCP abuse. (See *Review of Selected 1982 California Legislation* (1982-1983) 14 Pacific L.J. 357, 610-612.) The Legislature amended the Penal Code to preclude the granting of probation to persons convicted of knowingly furnishing or giving away PCP except in "unusual cases where the interests of justice would best be served." (Pen. Code, § 1203, subd. (e)(8); see Stats. 1982, ch. 1282, § 2, p. 4743.) The Legislature also prohibited the grant of probation to or the suspension of the sentence of persons convicted of (1) possessing for sale more than a half ounce of PCP; (2) offering, attempting, or actually importing, transporting, or administering PCP; (3) offering, selling, or manufacturing PCP or inducing a minor to commit such acts; and (4) possession of precursors of PCP with the intent to manufacture PCP. (Pen. Code, § 1203.07, subds. (a)(4)-(a)(8); see Stats. 1982, ch. 1282, § 3, pp. 4746-4747.) Finally, the Legislature added the manufacturing, selling, or compounding of more than a half ounce of PCP to those offenses which, when committed by a minor 16 years old or older, raise a presumption that the minor is unfit for trial in juvenile court. (Welf. & Inst. Code, § 707, subds. (b)(20) and (c); Stats. 1982, ch. 1282, § 4.)

### C. *Chapter 1635 of the Statutes of 1984*

One anomaly in the Act that existed until 1984 was that for all purposes *except* the regulation of prescriptions, "controlled substances" were those listed in the five schedules. However, the sections regulating prescriptions (§§ 11150-11208) used the schedules set forth in the Federal Controlled Substances Act (Tit. II, Pub.L. 91-513, 21 U.S.C. § 812). (See former § 11150.5 (Stats. 1976, ch. 1305, § 7, pp. 4638-4639).) In chapter 1635 of the Statutes of 1984 (chapter 1635), the Legislature eliminated this dual schedule system and provided for the use of a single set of schedules for all purposes. (See Legis. Counsel's Dig., No. 14 West's Cal. Legis. Service (1984 ed.) p. 30; No. 8 Deering's Adv. Legis. Service (1984 ed.) p. 559.) The Legislature did this by repealing the California schedules and enacting new schedules which generally paralleled the federal ones.

Chapter 1635 made numerous changes in the schedules. Among them, it expanded the list in Schedule II, section 11055, of PCP related substances and reorganized their placement.[9] The new schedules necessitated enact-

---

[9]Certain PCP analogs were moved from subdivision (e) in Schedule II to Schedule I, section 11054, subdivisions (d)(21) to (d)(23). PCP itself remained in Schedule II, but was listed more specifically than before in section 11055, subdivision (e)*(3)*. Finally, a new subdivision (f) was added to Schedule II to include, inter alia, immediate precursors of PCP (§ 11055, subds. (f)(2)(A) and (f)(2)(B) (subdivision (f)).)

As amended, Schedule II, in relevant part, read as follows: "(e) Depressants. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture,

ment of conforming amendments to update the internal cross-references in other sections of the Act.

The conforming amendments to those sections relating to offenses involving controlled substances formerly called "Narcotics" reflected minor changes in cross-reference numbers, and caused no change in the substance of the law.[10]

However, as to the sections which dealt with offenses involving substances formerly called "Restricted Dangerous Drugs" (and PCP precursors), sections 11377-11383, the conforming amendments did not fully integrate the schedule changes made as to PCP and related substances. As a result, these amendments created inconsistencies in the treatment of PCP offenses and opened up gaps in the scheme of complementary criminal statutes covering all controlled substances.

For example, in amending section 11377 (simple possession), the Legislature failed to include a cross-reference to the newly added subdivision (f) of Schedule II (containing PCP precursors). This omission made it appear that simple possession of certain controlled substances (i.e., PCP precursors) was legal, or at least not explicitly proscribed. Similarly, the amend-

---

or preparation which contains any quantity of the following substances having a depressant effect on the central nervous system, including its salts, isomers, and sales of isomers whenever the existence of those salts, isomers, and sales of isomers is possible within the specific chemical designation: [¶] (1) Amobarbital. [¶] (2) Pentobarbital. [¶] *(3) Phencyclidine.* [¶] (4) Secobarbital. [¶] *(f) Immediate precursors. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances:* [¶] (1) Immediate precursor to amphetamine and methamphetamine: [¶] (A) Phenylacetone. Some trade or other names: phenyl-2 propanone; P2P; benzyl methyl ketone; methyl benzyl ketone. [¶] *(2) Immediate precursors to phencyclidine (PCP):* [¶] *(A) 1-phenylcyclohexylamine.* [¶] *(B) 1-piperidinocyclohexane Carbonitrile (PCC).* [¶] The Attorney General, or his or her designee, may, by rule or regulations, add additional analogs of phencyclidine to those enumerated in this subdivision after notice, posting, and hearing pursuant to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code. The Attorney General shall, in the calendar year of the regular session of the Legislature in which the rule or regulation is adopted, submit a draft of a proposed bill to each house of the Legislature which would incorporate the analogs into this code. No rule or regulation shall remain in effect beyond January 1 after the calendar year of the regular session in which the draft of the proposed bill is submitted to each house. However, if the draft of the proposed bill is submitted during the recess of the Legislature exceeding 45 calendar days, the rule or regulation shall be effective until January 1 after the next calendar year." (Italics added.)

[10]For example, in the new Schedule I (§ 11054), the positions of mescaline, peyote, and tetrahydrocannibinols were changed from subdivisions (d)(11), (d)(12), and (d)(17) to (d)(14), (d)(15), and (d)(20), respectively. Thus, to maintain section 11350's proscription against possession of these substances, chapter 1635 simply substituted the new cross-reference numbers. Identical, nonsubstantive changes were made in the other sections dealing with substances formerly called "Narcotics." (See former §§ 11351-11355, 11364-11366, and 11370 (Stats. 1984, ch. 1635, §§ 50-60.)

ments to sections 11378 and 11378.5 (possession for sale) resulted in incongruous treatment of PCP and related substances. As noted above, the Legislature in 1978 isolated PCP in its own section 11378.5, to increase the punishment for possession of PCP for sale. In chapter 1635, the Legislature added a reference to PCP precursors (subdivision (f)) to section 11378.5, but removed PCP itself and returned it to section 11378. The net effect of these changes was to maintain stiff penalties for possessing PCP precursors for sale but to lower the penalties as to PCP itself.

More incongruous, however, were the amendments to those sections proscribing the sale of controlled substances. As with possession of PCP for sale, actual sale of PCP had been separately proscribed in section 11379.5 to increase its punishment. In amending this section, the Legislature added a reference to the PCP precursors (subdivision (f)), but removed the reference to PCP itself. However, the Legislature failed to add a reference to PCP in section 11379, the more general section proscribing sale. The net effect was to remove entirely the proscription against selling PCP.[11]

Given chapter 1635's apparent legalization of sale of PCP, defendants quickly sought to have the charges of selling PCP dismissed.

### D. Postscript: Chapter 3 of the Statutes of 1985

One day after the trial court denied defendants' motion to dismiss and 29 days after chapter 1635 became effective, sale of PCP, among other things, was again explicitly proscribed. On January 29, 1985, chapter 3 of the Statutes of 1985 (chapter 3) became effective as urgency legislation. Chapter 3 closed the gaps and rectified the incongruities concerning PCP offenses that chapter 1635 had created. It reestablished the seamless scheme of complementary penal statutes which, prior to chapter 1635, had provided comprehensive control of *all* controlled substances. It also restored the scope of those sections which had been specially enacted to punish possession for sale and sale of PCP more harshly.[12]

---

[11]The same sort of deletion occurred with respect to being under the influence of PCP (§ 11550), using a minor as an agent to commit PCP offenses (§ 11380), and manufacturing PCP (§ 11379).

[12]Specifically, chapter 3, among other things, amended section 11377 (simple possession) to include the PCP precursors added in subdivision (f); it took PCP itself out of section 11378 (possession for sale) and returned it to section 11378.5; it put PCP back into section 11379.5 (sale of designated substances); it proscribed the manufacture of any and all controlled substances without a valid license (§ 11379.6); it returned PCP to section 11380.5 (using a minor to commit PCP offenses); it added the PCP precursors in subdivision (f) to section 11382 (agreeing to furnish designated controlled substances); and it returned PCP to section 11550 (being under the influence of controlled substances). (See Stats. 1985, ch. 3, No. 1 West's Cal. Legis. Service, pp. 9-14; No. 1 Deering's Adv. Legis. Service, pp. 13-20.)

The Legislature explained the need for chapter 3 as follows: "SEC. 16. The Legislature finds and declares that Chapter 1635 of the Statutes of 1984 was enacted solely to conform California's schedules to federal law wherever possible. Over 100 sections in nine separate codes were amended by the measure, which passed the Assembly on the consent calendar and the Senate by unanimous vote. [¶] The Legislature further finds and declares that after enactment of the measure it was discovered that the bill contained drafting errors in technical cross-references inadvertently creating ambiguities regarding the applicability of a number of provisions of prior law regarding the manufacture, sale, or use of certain controlled substances. Accordingly, this measure was introduced at the earliest opportunity available to correct those errors and clarify the continued application of all previous provisions prohibiting the manufacture, sale, or use of controlled substances. It additionally adds provisions unanimously approved by the Legislature in Assembly Bill No. 3165 of the 1983-84 Regular Session of the Legislature regarding the manufacture of controlled substances. [¶] The Legislature therefore expressly finds and declares that Chapter 1635 of the Statutes of 1984 was not intended to reduce or eliminate in any manner previously existing prohibitions against or penalties for the manufacture, sale, or use of controlled substances. . . . [¶] SEC. 19. This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting the necessary [*sic*] are: [¶] In order to prevent the further manufacture of controlled substances and to clarify other provisions of law relating to controlled substances at the earliest possible time, it is necessary that this act take effect immediately."

## II. APPLICABILITY OF THE COMMON LAW RULE OF ABATEMENT

Both in the trial court and now on appeal, defendants contend that as soon as chapter 1635 removed the proscription against selling PCP, the common law rule of abatement applied and precluded further prosecution on such charges. We disagree.

California has long followed the common law rule that when a criminal statute is repealed, all proceedings against an accused not reduced to final judgment are terminated unless there is a savings clause or legislative intent to the contrary.[13] (*Spears* v. *County of Modoc* (1894) 101 Cal. 303,

---

[13]In *Spears* v. *County of Modoc, supra*, 101 Cal. 303, 305, the California Supreme Court explained the rule at length: "[T]he effect of repealing a statute is 'to obliterate it as completely from the records of the parliament as if it had never passed; and it must be considered as a law that never existed, except for the purpose of those actions which were commenced, prosecuted, and concluded whilst it was an existing law.' This principle has been applied more frequently to penal statutes, and it may be regarded as an established rule that the

305 [35 P. 869]; *In Re Estrada* (1965) 63 Cal.2d 740, 746-747 [48 Cal.Rptr. 172, 408 P.2d 948]; *People* v. *Babylon* (1985) 39 Cal.3d 719, 725 [216 Cal.Rptr. 123, 702 P.2d 205]; see 1 Witkin, Cal. Crimes (1963) § 35, p. 39 and supp. 1985, pp. 62-64; 17 Cal.Jur.3d, Criminal Law, §§ 7-8, pp. 32-34; 22 C.J.S., Criminal Law, § 27, p. 89; 73 Am.Jur.2d, Statutes, § 418.)

The common law rule "is based on presumed legislative intent, it being presumed that the repeal was intended as an implied legislative pardon for past acts." (*Sekt* v. *Justice's Court* (1945) 26 Cal.2d 297, 304 [159 P.2d 17, 167 A.L.R. 833].) "Where the Legislature has seen fit to repeal a statute making certain acts a crime it is reasonable to assume that in the absence of a saving clause the Legislature would not have desired that anyone should be punished for what, by the repeal, it has now determined is not a crime."[14] (*Id.*, at p. 308.) This rationale applies even where, instead of repealing a criminal statute, the Legislature decreases the punishment for violating it. Thus, it is presumed that the Legislature intended that the benefits of such legislation apply immediately wherever possible. Hence, a defendant is entitled to be sentenced under the new statute, reducing the punishment for his offense. (*In Re Estrada, supra,* 63 Cal.2d 740, 745-748; see, e.g., *Governing Board* v. *Mann* (1977) 18 Cal.3d 819 [135 Cal.Rptr. 526, 558 P.2d 1]; *People* v. *Benefield* (1977) 67 Cal.App.3d 51 [136 Cal.Rptr. 465]; *Weissbuch* v. *Board of Medical Examiners* (1974) 41 Cal.App.3d 924 [116 Cal.Rptr. 479];, see also *People* v. *Harmon* (1960) 54 Cal.2d 9, 27-33 [4 Cal.Rptr. 161, 351 P.2d 329] (dis. op. of Peters, J.).)

---

repeal of a penal statute without any saving clause has the effect to deprive the court in which any prosecution under the statute is pending of all power to proceed further in the matter. 'The repeal of a statute puts an end to all prosecutions under the statute repealed, and to all proceedings growing out of it pending at the time of the repeal.' (Sedgwick's Statutory and Constitutional Law, 130. . . .) 'If a penal statute is repealed pending an appeal, and before the final action of the appellate court, it will prevent an affirmance of a conviction, and the prosecution must be dismissed, or judgment reversed.' (Sutherland on Statutory Construction, sec. 166.)"

[14]This reasoning is exemplified in *Bell* v. *Maryland* (1964) 378 U.S. 226, 230 [12 L.Ed.2d 822, 826, 84 S.Ct. 1814]. In *Bell,* blacks had been arrested and convicted under state trespassing laws after they failed to leave businesses that had refused to serve them because of their race. During the pendency of their appeal, the state passed anti-discrimination laws, making it a crime for businesses to discriminate on the basis of race. In effect, the Legislature converted what had been the defendants' crime into a right and what had been the businesses' right into a crime. In light of these circumstances, the Supreme Court concluded that passage of the new laws abated the defendants' prosecutions for trespassing which had not yet reached final judgment. (See also, e.g., *People* v. *Babylon, supra,* 39 Cal.3d 719 [amendments to Pen. Code, § 593e, narrowed the former proscription against unauthorized interception of *any* over-the-air transmission signals to cover only "encoded" transmissions, thereby eliminating the former proscription against intercepting unencoded signals and abating prosecution for such acts]; *People* v. *Rossi* (1976) 18 Cal.3d 295 [134 Cal.Rptr. 64, 555 P.2d 1313] [amendment to Pen. Code, § 288a, narrowed the proscription against oral copulation to cover only acts by force, thereby eliminating the former proscription against such acts by consenting adults and abating prosecution for such acts].)

■ However, because the rule is based on a presumed legislative intent, it does not apply automatically upon the repeal of a statute. "Where the reason for the rule ceases the rule should not apply." (*Sekt* v. *Justice's Court, supra,* 26 Cal.2d at p. 308.) That is, where the circumstances of the repeal do not reasonably give rise to the presumption of a legislative pardon and remission of crimes not reduced to final judgment, the rule is inapplicable and a prosecution may be maintained even in the absence of a savings clause. (See *Sekt* v. *Justice's Court, supra,* 26 Cal.2d at pp. 305-309; *Sobey* v. *Malony* (1940) 40 Cal.App.2d 381, 385 [104 P.2d 868].)

■ Thus, for example, where the Legislature repeals a criminal statute but reenacts it in substantially the same form, with either an increased or decreased punishment, it is more reasonable to presume that the Legislature intended to punish people who committed crimes under the old statute than to presume an intent to let such persons go free. (See *Sekt* v. *Justice's Court, supra;* see also *In Re Estrada, supra,* 63 Cal.2d 740, 747; *Sobey* v. *Malony, supra,* 40 Cal.App.2d 381, 385.) Indeed, the reenactment rebuts any presumed intent to pardon such persons. The same reasoning applies in this case.

Clearly, in passing chapter 1635, the Legislature intended to change the Act. (Cf. *Loew's Inc.* v. *Byram* (1938) 11 Cal.2d 746, 749 [82 P.2d 1].) However, it is absurd to presume that one of the intended changes was to legalize the sale of PCP, and there is ample evidence that the "repeal" was not intentional. Initially, we note that legalizing the sale of PCP would represent a dramatic divergence from the legislative history of the Act, which, as noted above, reveals the Legislature's increasing awareness of the dangerousness of PCP and ever-stronger measures to control it. (See Discussion, *ante,* at pp. 1253-1256.) However, in chapter 1635, the Legislature left PCP on the list of controlled substances and, in fact, expanded the list to include PCP precursors. This continued and expanded presence of PCP and related substances clearly indicates that the Legislature still considered PCP to be a dangerous drug with a high potential for abuse. (Cf. *People* v. *Bolden* (1978) 62 Ill.App.3d 1009 [20 Ill.Dec. 79; 379 N.E.2d 912, 915].) Moreover, as the People point out, the Legislature did not change Penal Code section 1203.07, subdivision (a)(6), which disqualifies sellers of PCP from receiving probation. (See Discussion, *ante,* at p. 1256.)

Chapter 1635's sudden inconsistent and incongruous treatment of PCP offenses (e.g., proscribing being under the influence of PCP precursors but not PCP; proscribing possession of PCP but not its sale; maintaining harsh penalties for possession for sale of PCP precursors but not PCP itself) strongly suggests confusion and errors in drafting the various amendments

and reenacted statutes that made up the chapter.[15] This suggestion is further strengthened when one considers the Act's complex scheme of interrelated complementary statutes, the complicated task of updating the cross-references to reflect the new schedules, and the fact that chapter 1635 involved the simultaneous amendment of dozens of other statutes in the Business and Professions, Education, Government, Penal, Vehicle, and Welfare and Institutions Codes.[16] Certainly such circumstances created a dangerous potential for drafting errors.[17]

The lack of intent to legalize sale of PCP becomes even more evident in light of the absurd consequences such legalization would have. For example, although selling PCP might be legal, selling "imitation" PCP would not. (See §§ 11680, 11681.) Although a conviction for possession of PCP for sale would continue to have a serious negative impact on the jobs and licenses of doctors, nurses, pharmacists, school administrators, teachers, public officials, and employees, such professionals and public officers could theoretically sell PCP with impunity and without risk to their careers. (See, generally, statutes referred to in fn. 16, *ante.*) Finally, in legalizing sale of PCP, the California Legislature would set California apart from the federal government, the 49 other states, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands, all of which have prohibited the sale of PCP since adopting, as California itself did, a version of the Uniform Controlled Substances Act of 1970. (See 9 U. Laws Annot. (Master Ed. 1979) pp. 187-194 and Supp. (1985) pp. 117-118.)[18] Common sense rebels against the

---

[15]In *Henry* v. *Municipal Court* (1985) 171 Cal.App.3d 721, 722-723 [214 Cal.Rptr. 726], the court also viewed the gaps and inconsistencies in chapter 1635's treatment of PCP offenses as having resulted from legislative errors.

[16]For a list of all the statutes amended, repealed, or added to the various Codes by chapter 1635, see No. 14 West's California Legislative Service (1984) page 30.

[17]Defendants cite the statement in the Legislative Counsel's Digest that chapter 1635 would delete the prohibition against the manufacturing or compounding of specified controlled substances as evidence that perhaps the Legislature did intend to legalize the sale of PCP. (See No. 14 West's Cal. Legis. Service (1984) p. 31.) We find this evidence unpersuasive.

Counsel's statement does not mention sale of PCP and, therefore, it reasonably suggests that any allegedly intentional legalization of previously prohibited acts was limited to manufacturing. In any event, we do not read counsel's statement as evidence even of an intent to legalize manufacturing. Chapter 1635's deletion of the proscription against manufacturing was an inadvertent error of a different sort. The removal of the proscription against manufacturing from section 11379 was to be accompanied by the simultaneous enactment of a new statute increasing the punishment for manufacturing. (See note concerning 1985 legislation, 40 West's Annot. Cal. Codes Supp. (1986) p. 130.)

[18]Actually, all jurisdictions *except* New Hampshire and Vermont adopted a version of the model act. For a list of the statutes proscribing sale of PCP in these jurisdictions, see 40 West's Annotated Health and Safety Code Supplement (1986) pages 25-26. In New Hampshire, sale of PCP is proscribed in New Hampshire Revised Statutes Annotated, chapters 318:1:X and 318:B:1-30; in Vermont, 18 Vermont Statutes Annotated, section 4224, subdivision (g); see *State* v. *Connarn* (1980) 138 Vt. 270 [413 A.2d 812].

notion that our Legislature intended to take such an independent stand concerning sale of PCP or that it would do so without any acknowledgment or explanation.

A finding that the ostensible legalization of PCP sales resulted from a drafting error and was not an intended change in the law is corroborated implicitly by the speed and urgency with which the Legislature reproscribed. sale in chapter 3 and explicitly by the legislative declarations in chapter 3 concerning chapter 1635. (See pp. 1258-1259, *ante.*)

In light of our discussion, we conclude that where, as here, it is obvious that the Legislature inadvertently deleted the sanctions against selling PCP because of a drafting error, such a "repeal" cannot and does not reflect an intent to pardon illegal sales that were committed prior to the error. Therefore, we hold that under such circumstances, the rule of abatement is inapplicable.[19] Our holding is supported by the fact that chapter 3 represents the substantial reenactment of the law against sale of PCP as it read prior to the passage of chapter 1635. (See *Henry* v. *Municipal Court, supra,* 171 Cal.App.3d 721, 725.) ■ It is settled that given such reenactments of repealed or amended statutes, courts presume that the Legislature did not intend a remission of crimes not reduced to final judgment. (*In Re Dapper* (1969) 71 Cal.2d 184, 189 [77 Cal.Rptr. 897, 454 P.2d 905].)

■ Defendants claim that because chapter 1635 clearly and completely removed the sanctions against selling PCP, this court has no need to investigate the legislative intent behind or interpret chapter 1635. Indeed, defendants argue that under the circumstances, the legislative intent is irrelevant and their prosecutions for selling PCP abated as a matter of law. Defendants also argue that the Legislature's subsequent declarations in chapter 3 may not properly be deemed conclusive of its intent in passing chapter 1635.

---

[19]We note that in *Henry* v. *Municipal Court, supra,* 171 Cal.App.3d 721, the court faced virtually the same issue presented here. In *Henry,* the defendant petitioned the Court of Appeal for a writ to compel the trial court to dismiss his case on grounds that his prosecution for being under the influence of PCP (§ 11550) abated after the passage of chapter 1635. Significantly, unlike defendants here, the defendant in *Henry* did not press his claim of abatement until *after* the Legislature passed chapter 3 and reestablished the proscription against being under the influence of PCP.

The petition was denied. The court explained that although there may have been merit to the defendant's claim that his prosecution under the former law abated, the defendant's prosecution could be continued under the new law since doing so would not violate the prohibition against ex post facto laws. (*Id.* at pp. 724-725.)

We agree with the result in *Henry*; however, as is clear from our discussion, we disagree with the court's suggestion in dicta that the continued prosecution under the former law *prior* to the passage of chapter 3 abated.

Although the fact of the deletions in chapter 1635 is clear, the applicability of the rule of abatement is not automatic, but depends on whether the presumption of a legislative pardon reasonably arises from (or is rebutted by) the particular legislation. Under the circumstances, we must discern the legislative intent to determine the propriety of applying the rule to avoid absurd consequences. In doing so, we may consider all factors which may give a clue to such intent, including legislative declarations in subsequent legislation. (See *Honey Springs Homeowners Assn.* v. *Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1137 [203 Cal.Rptr. 886]; see also *Del Costello* v. *State of California* (1982) 135 Cal.App.3d 887, 893, fn. 8 [185 Cal.Rptr. 582]; *People* v. *Cuevas* (1980) 111 Cal.App.3d 189, 199-200 [168 Cal.Rptr. 519].)

### III. Applicability of Government Code Section 9608

 There is a second reason why the rule of abatement is inapplicable in this case. Under the rule, the repeal of a statute does not terminate the proceedings in prosecutions that began before the repeal if there is a saving clause preserving them.

Chapter 1635 did not itself contain a special saving clause. However, California has a general saving clause in Government Code section 9608, and such a clause is just as effective as a specific one.[20] (*People* v. *McNulty* (1892) 93 Cal. 427, 437 [29 P. 61]; cf. *Peterson* v. *Ball* (1931) 211 Cal. 461 [296 P. 291, 74 A.L.R. 187].) This clause provides: "The termination or suspension (by whatsoever means effected) of any law creating a criminal offense does not constitute a bar to the indictment or information and punishment of an act already committed in violation of the law so terminated or suspended, unless the intention to bar such indictment or information and punishment is expressly declared by an applicable provision of law." (Gov. Code, § 9608.)

California courts initially viewed this general saving clause (and its predecessors, former Pol. Code, § 329 (enacted Mar. 12, 1872, amend. Stats. 1881, ch. 8, § 1, p. 6); and before that, Laws of California (1850-1853) p. 920 (Stats. 1853, ch. 138, § 1, p. 195)) as a legislative repudiation of the common law rule of abatement. (*Sekt* v. *Justice's Court, supra,* 26 Cal.2d 297, 300; *People* v. *Harmon, supra,* 54 Cal.2d 9, 21, disapproved in *In Re Estrada, supra,* 63 Cal.2d 740, 742; see cases cited in *People* v. *Rossi, supra,* 18 Cal.3d 295, 299, fn. 5; cf. *People* v. *Quinn* (1861) 18 Cal. 122, 125; *Martinez* v. *People* (1971) 174 Colo. 365 [484 P.2d 792];

---

[20]For a discussion of the effects of a general saving clause, see 1A Sutherland, Statutory Construction (4th ed. 1972) sections 23.37, 23.38.

*People In Interest of M. K. A.* (1973) 182 Colo. 172 [511 P.2d 477], 479; *State* v. *Matthews* (1973) 131 Vt. 521 [310 A.2d 17].)

More recently, however, in *People* v. *Rossi, supra,* 18 Cal.3d 295, 299-300, the California Supreme Court opined that this general saving clause was not meant to abrogate the common law rule, but only to prevent its mechanical application and forestall the "technical abatement" of prosecutions where the repeal of a statute was clearly not intended as a pardon for past conduct. Citing *People* v. *McNulty, supra,* 93 Cal. 427, the court illustrated such "technical abatement," explaining that where the Legislature repeals a penal statute and reenacts it increasing the punishment, a defendant who committed the proscribed act prior to the repeal "could not be punished under the old law because it no longer existed, and he could not be punished under the new law because its attempted application would render it an ex-post facto law." The general saving clause, however, prevents abatement and preserves the prosecution under the former law.[21]

In *McNulty,* the court explained that general saving clauses were "intended to prevent the miscarriage of justice in cases where the legislature should repeal or substantially change a penal statute, and neglect to put a special saving clause into the new enactment." (*People* v. *McNulty, supra,* 93 Cal. at p. 437.) Quoting *United States* v. *Barr* 4 Saw. 254, the *McNulty* court further explained that a general saving clause is a " 'salutary provision, and if it, or something like it, had always been incorporated in the statutes . . ., it would have prevented many a lame and impotent conclusion in criminal cases, in which the defendant escaped punishment because the legislature, in the hurry and confusion of amending and enacting statutes, had forgotten to insert a clause to save offenses and liabilities already committed or incurred from the effect of express or implied repeals.' " (*Ibid.*)

This case presents circumstances analogous to those illustrated by the *Rossi* court that created the need for a general saving clause. Clearly, the purpose of the clause is served where, as here, in the "hurry and confusion" of major legislative activity involving changes in over 100 statutes, the Legislature, through an inadvertent drafting error, eliminated for a period of 29 days the sanctions against selling PCP. To treat such an error as if it were a formal, intentional repeal, triggering the common law rule of abatement, would permit the type of "technical abatement" that the general saving clause was designed to prevent.

---

[21]As noted above, however, the Supreme Court has also expressed the view that under these particular circumstances (and even where a new statute lessens punishment), no saving clause is needed to prevent abatement because the reenacted proscription itself rebuts the presumption that the repeal was meant as a pardon. (See Discussion, *ante,* at p. 1261.)

Given our analysis and conclusions, we hold that the trial court properly denied defendants' motion to dismiss the charges of selling PCP.

The judgments are affirmed.

Agliano, Acting P. J., and Brauer, J., concurred.