[No. B021980. Second Dist., Div. Four. July 6, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
FLORENCE VAUGHN JACKSON, Defendant and Appellant.

**COUNSEL**

Dennis A. Fischer and Alisa M. Weisman for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Susanne C. Wylie and Jane Began Sagehorn, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McCLOSKY, J.**—In an information defendant Florence Vaughn Jackson was charged with grand theft (Pen. Code, § 487, subd. (1)). Therein it was further alleged that the funds which she intentionally took exceeded $100,000 (Pen. Code, § 12022.6, subd. (b)).

On January 22, 1985, defendant waived her right to a jury trial and agreed to have her case determined by Judge Everette Ricks sitting as the trier of fact.

On December 6, 1985, defendant submitted the issue of her guilt, in part, on the transcript of the preliminary hearing. Appropriate waivers were taken and defendant acknowledged that in all probability she would be found guilty. Trial commenced before Judge Ricks and additional testimony was heard. An adjournment was thereafter taken until December 13, 1985.

On that day, the trial concluded. Judge Ricks found defendant "guilty of the charge in this matter," but made no finding on the excessive taking allegation. The probation and sentencing hearing was scheduled for January 31, 1986.

On January 31, 1986, defendant failed to appear. Judge Ricks issued a bench warrant and ordered that it be held until March 7, 1986.

On March 7, 1986, defendant appeared before Judge Ronald E. Cappai, and the bench warrant was quashed.

On July 10, 1986, following numerous continuances, defendant's probation and sentencing hearing was held before Judge Cappai.

At that hearing defendant moved "to continue the matter for the return of Judge Ricks to impose sentence." Judge Cappai denied the motion, observing that Judge Ricks had not been on the bench since February 21, 1986, that he has since applied for disability retirement and that there was, according to the presiding judge, a great likelihood that Judge Ricks would not be returning to the bench.

Defendant then moved to have her conviction set aside, to withdraw her waiver of a jury trial and for a new trial. This motion was premised on the fact that she had waived her right to a jury trial in contemplation that Judge Ricks would try the case and implicitly would impose sentence. This motion, too, was denied.

Defendant then objected to the pronouncement of sentence on the ground that Judge Ricks had not made a finding on the excessive taking allegation. Judge Cappai denied defendant's motion to strike the allegation and, after a review of the evidence, he found the allegation to be true.

Sentence was then pronounced. For her crime of grand theft, defendant was sentenced to the middle term of two years. Pursuant to Penal Code section 12022.6, subdivision (b) that sentence was enhanced an additional two years. This appeal followed.

Defendant contends (1) that the evidence is insufficient to support a conviction of grand theft by embezzlement or false pretenses; (2) that under *People* v. *Arbuckle* (1978) 22 Cal.3d 749 [150 Cal.Rptr. 778, 587 P.2d 220, 3 A.L.R.4th 1171], the sentencing judge erroneously denied her motion to withdraw her jury waiver; and (3) that the excessive taking enhancement must be stricken because it was improperly found to be true by the sentencing judge rather than by the trial judge.

### STATEMENT OF FACTS

*Preliminary Hearing*

In the early part of 1981, Dr. Henry Palmer and his wife retained defendant, then an attorney, to help them complete the sale of a Los Angeles hotel which they owned with two partners.

In April and June 1981, the Palmers received three checks in the amounts of $123,683.74, $68,000 and $138,838.46 representing their proceeds from the sale of the hotel. The Palmers gave all of this money to defendant to invest for them.

Defendant had informed Dr. Palmer that she would invest the money by making a short-term loan to Camp Fricot, a Baptist Conference property in Calaveras County, and that the loan was to be for less than one year.

In April 1981, the Palmers endorsed the $123,683.74 check to defendant who in turn gave them an assignment of her interest in a deed of trust in the Camp Fricot property. In June 1981, the Palmers endorsed the $68,000 and $138,838.46 checks and gave them to defendant to invest. Defendant in turn gave the Palmers an amended assignment of the deed of trust in the Camp Fricot property. Although Dr. Palmer read the documents of assignment of interest in a trust deed, he did not know what they were or understand them. When he asked defendant to explain them, she stated, "Don't worry about this, Dr. Palmer. We will take care of the whole thing. I am moving my office at this time." Defendant never explained the documents to Dr. Palmer.

On April 30, 1981, defendant opened an account at Wilshire State Bank with the $123,683.74 check given to her by the Palmers. On that day, a check for $20,883.99 was drawn from the account. A cashier's check was issued in lieu thereof. It was made payable to Project Action, Inc. and represented repayment of $17,000 that had been entrusted to her plus interest.

On July 1, 1981, defendant deposited the Palmers' other two checks in the account at Wilshire State Bank.

On July 10, 1981, a check made payable to Wilshire State Bank in the amount of $50,300 was drawn from the account by defendant. A cashier's check in the amount of $50,300 was issued in lieu thereof and was made payable to Benjamin Mathon and Todd Siegel. (At trial defendant testified that Benjamin Mathon and Todd Siegel were attorneys representing individuals who she had formerly represented. The check represented the amount defendant owed her former clients and a penalty.)

On July 23, 1981, defendant wrote a check for $54,550 to Mount Zion Towers, Inc. Defendant had served as counsel for the organization and the check represented the repayment of money that she had been given to hold in trust.

Between April 30 and August 31, 1981, defendant made three additional deposits. The record on appeal does not disclose the amounts of these deposits but none was more than $10,000.

In February 1983, defendant gave Dr. Palmer a check for $231,340.03 postdated to March 5, 1983. Defendant informed Dr. Palmer that she was

going to pay back the money she invested and that the check represented a partial payment of those funds. Dr. Palmer unsuccessfully tried more than five times to cash the check. He admitted, however, that defendant informed him that she postdated the check because she did not yet have the funds and that she told him she would give him a cashier's check to replace the check she gave him if she got the money.

By 1983, defendant paid the Palmers $10,000-$15,000. Defendant also gave the Palmers a note secured by a deed of trust dated July 4, 1984. This note was signed by John and Bernadine Beasley and promised repayment of $110,000.

*Trial*

Samuel DeSarno, trustee for the present legal owners of Camp Fricot, instituted foreclosure proceedings against Camp Fricot in 1977, 1978, and 1979. Negotiated agreements were reached in 1977 and 1978. The 1979 foreclosure was effected and became final in October 1980. The Baptist Conference and Camp Fricot, Inc. were the registered owners of the property at the time of foreclosure.

DeSarno's clients held the second trust deed on the Camp Fricot property. Defendant had a $250,000 interest in a third trust deed which was extinguished by the final foreclosure.

According to DeSarno, defendant was the attorney of record for the Baptist Conference and Camp Fricot, Inc. in all three foreclosure proceedings. Notice of the third and last default which was dated July 3, 1979, was sent to defendant by registered mail. Notice of foreclosure sale was also sent to defendant in late 1979.

In 1979, after the third notice of default was filed, the church group hired another attorney, Mr. Gardiner, to handle Chapter 11 bankruptcy proceedings. Because of these proceedings, Mr. Gardiner represented them in the final foreclosure sale which because of the bankruptcy proceedings had to be continued a number of times.

DeSarno testified that he was in constant communication with defendant "right up to the foreclosure itself, which was October of 1980." At that time, DeSarno gave defendant notice of the final foreclosure.

According to defendant, she did not know that the foreclosure sale had taken place when she assigned her interest in the third trust deed to the Palmers.

Defendant testified that as the attorney for Camp Fricot, Inc., a subsidiary of California State Baptist Convention, she received notice of the third and final default in the summer of 1979 and that the last notice of foreclosure she received was in October or November of 1979. She unequivocally asserted that she did not receive any notice of the foreclosure sale in 1980.

Defendant testified that she stopped representing the church group in late 1979, after Mr. Gardiner was hired to institute bankruptcy proceedings.

Defendant began representing the Palmers in 1979. She testified that after the sale of the hotel was completed, the Palmers asked her if she knew of any short-term investment with a high return that they could put their money into. Defendant informed the Palmers that one of the directors of Camp Fricot, Inc. called her and asked her to help them find some money to tide them over a sale of the property. Defendant stressed that the Palmers did not ask her to invest their money for them but rather asked if she knew of any short-term investments they could make. At that point defendant "suggested that they loan it to me for Camp Fricot and for the assignment of deed of trust ...."

According to defendant, the Palmers agreed to loan her $122,000 for 90 days in exchange for her assignment of her interest in a trust deed on the Camp Fricot property and a note for $142,235. The difference between the amount loaned and the amount to be paid back represented the Palmers' bonus. A further loan of $100,000 was made when the Palmers received the remainder of their proceeds from the sale of their hotel. The Palmers received a note for $117,000, and a further assignment of defendant's interest in the deed of trust in the Camp Fricot property.

The Palmers also loaned $105,000 to John and Bernadine Beasley who wished to purchase some property. The Beasley's executed a note for $110,000 in favor of the Palmers and secured that note by a deed of trust in the Beasley property. Defendant personally received the funds to be loaned to the Beasleys and deposited them into escrow with the Ticor Title Company.

Defendant testified that it was not until 1982 when the time to pay back the Palmers had passed that she learned of the Camp Fricot foreclosure sale.

By this time, defendant had already started to repay the Palmers. She testified that in total she paid them $29,000. Defendant did not dispute that she owed the Palmers money and she stated that she definitely planned to repay them.

Defendant admitted that there were no funds in the bank to cover the postdated check for $231,340.03 that she gave to Dr. Palmer in February 1983, but she noted that she so informed him and that she gave him the postdated check only because he insisted that she do so.

Defendant never gave any of the funds which the Palmers loaned her to Camp Fricot, Inc. She testified that its president had suffered a stroke and that the organization did not quite know what to do.

By August 31, 1981, only $600 remained in the Wilshire State Bank account.

### DISCUSSION

### I

■ Defendant first contends that the evidence is insufficient to support her conviction of grand theft. We disagree.

■ "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People* v. *Green* (1980) 27 Cal.3d 1, 55[164 Cal.Rptr. 1, 609 P.2d 468].)

■ Grand theft includes the crimes of embezzlement and of obtaining property by false pretenses. ■ "Embezzlement is defined as the fraudulent appropriation of property by one to whom it is entrusted. (Pen. Code, § 503.) The offense is complete when the agent or trustee diverts the trust property from the trust purpose. [Citation.] The crime is committed even though the intent is to deprive the owner of his property only temporarily." (*People* v. *Britz* (1971) 17 Cal.App.3d 743, 751 [95 Cal.Rptr. 303].)

■ Grand theft by false pretenses "consists of three elements: (1) the making of a false pretense or representation by the defendant, (2) the intent to defraud the owner of his property, and (3) actual reliance by the owner upon the false pretense in parting with his property." (*People* v. *Fujita* (1974) 43 Cal.App.3d 454, 467 [117 Cal.Rptr. 757], cert. den. *Fujita* v. *California* (1975) 421 U.S. 964 [44 L.Ed.2d 451, 95 S.Ct. 1952].)

■ When the evidence set forth in the statement of facts is viewed in light of the above legal principles, it is clear that defendant's grand theft

conviction is amply supported under both embezzlement and false pretenses theories.

## II

In reliance on *People* v. *Arbuckle, supra,* 22 Cal.3d 749, defendant contends that she was entitled to withdraw her jury trial waiver because Judge Ricks was unavailable to impose sentence.

Defendant Arbuckle had entered into a plea bargain agreement under the terms of which the particular judge who accepted the plea bargain was to pronounce sentence. Because that original judge was transferred to another department of the superior court, a different judge imposed sentence.

On appeal, this state's high court stated that "whenever a judge accepts a plea bargain and retains sentencing discretion under the agreement, an implied term of the bargain is that sentence will be imposed by that judge. Because of the range of dispositions available to a sentencing judge, the propensity in sentencing demonstrated by a particular judge is an inherently significant factor in the defendant's decision to enter a guilty plea." (22 Cal.3d at pp. 756-757.) The *Arbuckle* court concluded that because defendant had been denied that aspect of his bargain his sentence could not stand. The court further concluded that defendant was entitled to be sentenced by the original judge who accepted the plea bargain or, alternatively, to withdraw his plea if internal court administrative practices prevented the original judge from pronouncing sentence. (22 Cal.3d at p. 757.)

The *Arbuckle* court explained: "We recognize that in multi-judge courts, a judge hearing criminal cases one month may be assigned to other departments in subsequent months. However, a defendant's reasonable expectation of having his sentence imposed, pursuant to bargain and guilty plea, by the judge who took his plea and ordered sentence reports should not be thwarted for mere administrative convenience. If the original judge is not available for sentencing purposes after a plea bargain, the defendant must be given the option of proceeding before the different judge available or of withdrawing his guilty plea." (22 Cal.3d at p. 757, fn. 5.)

It is readily apparent that the instant matter does not involve a plea bargain agreement and hence is distinguishable from *Arbuckle.* Nevertheless, assuming without deciding that the reasoning of *Arbuckle* applies where a defendant agrees to waive his or her right to a jury trial on the condition that he or she be tried and implicitly sentenced by a particular judge, we conclude that under the facts in this particular case defendant was

not entitled to have her conviction set aside and a new trial granted or to withdraw her jury waiver.

As the court aptly noted in *People* v. *Dunn* (1986) 176 Cal.App.3d 572, 575 [222 Cal.Rptr. 273], "*Arbuckle* specifically dealt with the situation when 'internal court administrative practices' render it impossible or impracticable for the judge who accepts a defendant's plea to impose the sentence.... [¶] While it is established that the implied term of a negotiated plea first recognized by *Arbuckle* will override competing administrative practices of the court, it is clear to us that a negotiated plea does not carry with it an implied promise that the judge accepting the plea will not resign, retire, expire or be removed from the bench pending imposition of sentence. The People appropriately bear the risk of a judge's unavailability due to matters within the control of the court, but no good reason appears why they should bear the risk that the judge before whom defendant plead is no longer vested with judicial power to pass sentence. ▆▆ To the implied term recognized by *Arbuckle* that the judge accepting the plea will impose sentence must be added an implied condition: if that judge still actively exercises judicial power."

The *Dunn* court then went on to hold "that *Arbuckle* does not apply in a case where the judge's unavailability is due not to internal administrative problems or convenience of the court but to retirement of the judge, a matter clearly beyond the power of the court to control." (176 Cal.App.3d at p. 575.)

▆▆ In the present case, Judge Ricks's unavailability was not due to mere administrative convenience or internal court administrative practices. Pending imposition of sentence Judge Ricks became ill. At the time of sentencing on July 10, 1986, Judge Ricks had been on disability leave for almost five months. During that time he had applied for disability retirement, and his return to the bench was not anticipated. Under these circumstances, the reasoning of *Arbuckle* is not applicable. Defendant was properly sentenced by Judge Cappai as she was not entitled under the rationale of *Arbuckle* to a vacation of her conviction and a new trial or to withdraw the waiver of her right to a jury trial.

Of equal import, we note that had defendant not failed to appear as ordered on January 21, 1986, for the probation and sentencing hearing scheduled for that date she would in fact have been sentenced by Judge Ricks. The risk of Judge Ricks's unavailability in the first instance must therefore be borne by defendant herself.

## III

■ Lastly, defendant contends that the excessive taking allegation must be stricken and her state prison sentence reduced by two years because Judge Ricks failed to make a finding that it was or was not true. We agree.

At the conclusion of the trial on December 13, 1985, Judge Ricks rendered his verdict finding defendant "guilty of the charge in this matter." Contrary to plaintiff's assertion, this verdict did not contain a finding that the excessive taking allegation was true. The trial court's minute order of December 13, 1985, indicates only that it found defendant guilty of grand theft. No mention is made of the excessive taking allegation. Moreover, on July 10, 1986, at the probation and sentencing hearing Judge Cappai concurred in defense counsel's assertion that it was Judge Ricks's practice to make a finding on any special enhancement allegation on the day of the probation and sentencing hearing after he had the opportunity to review the pertinent sentencing considerations. Judge Cappai stated that his review of other matters which he handled corroborated defense counsel's position.

Judge Cappai went on to conclude, however, that he had the power to make that finding and proceeded to do so. After a review of all the evidence, Judge Cappai found the excessive taking allegation to be true. Defendant challenges Judge Cappai's power to do so.

Penal Code section 12022.6, in pertinent part, provides that the "additional terms provided in this section shall not be imposed unless the facts of the taking, damage, or destruction in excess of the amounts provided in this section are charged in the accusatory pleading and admitted or found to be true by the trier of fact."

Penal Code section 1167 provides: "When a jury trial is waived, the judge or justice before whom the trial is had shall, at the conclusion thereof, announce his findings upon the issues of fact, which shall be in substantially the form prescribed for the general verdict of a jury and shall be entered upon the minutes."

The trial in this matter concluded on December 13, 1985. At that time and in accordance with Penal Code section 1167, Judge Ricks was required to make a finding as to the truth of the excessive taking allegation; however, he failed to do so. In the absence of an agreement by defendant, Judge Cappai who was not the trier of fact and who did not hear the witnesses testify at the trial could not make that determination at the time of sentencing. Penal Code section 1053 does not compel a contrary conclusion.

The judgment is modified by striking the excessive taking finding, as well as the two-year enhancement imposed pursuant thereto. As so modified, the judgment is affirmed.

Kingsley, Acting P. J., and Cole, J.,* concurred.

A petition for a rehearing was denied July 29, 1987.

* Assigned by the Chairperson of the Judicial Council.