[No. G009893. Fourth Dist., Div. Three. Sept. 19, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
LELAS CHARLES GENTRY, Defendant and Appellant.

134

COUNSEL

Robison D. Harley, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Robert M. Foster and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SILLS, P. J.—In this modern computer age, creative entrepreneurs are carving out large fortunes by providing new and unique services to the untrained public. Lelas Charles Gentry was just such an entrepreneur, advertising his services in the field of credit history improvement to individuals who found themselves floundering in a financial morass. Unfortunately, rather than throwing them a lifeline, he merely offered them a rope and anchor.

Gentry was convicted of three counts of illegal computer access (Pen. Code, § 502, subd. (b)),[1] one count of grand theft (Pen. Code, § 487, subd.

---

[1] In 1987, Penal Code section 502, subdivision (b), stated: "Any person who intentionally accesses or causes to be accessed any computer system or computer network for the purpose of (1) devising or executing any scheme or artifice to defraud or extort, or (2) obtaining money, property, or services with false or fraudulent intent, representations, or promises, is guilty of a public offense."

Penal Code section 502, subdivision (c), now states, "Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense: [¶] (1)

(1)) and one charge of unlawful use or manufacture of a driver's license (Veh. Code, § 14610, subd. (g) [as it read in 1987]). He was acquitted of one charge of counterfeiting a driver's license (Pen. Code, § 470a). He challenges his conviction on four grounds: (1) the evidence was insufficient to support the grand theft conviction; (2) the evidence was insufficient to support the computer access charges; (3) the unlawful use or manufacture of a license was a lesser related offense of counterfeiting a driver's license and he did not consent to such a finding; and (4) his conviction for illegal computer access should be reversed because the law has been changed since his conviction. We affirm in part and reverse in part.

## FACTS

Gentry was convicted based on the transcript of a preliminary hearing received into evidence without objection. At that preliminary hearing, three witnesses, each representing a different credit reporting company (TRW, CBI and Trans Union), testified about the nature of their businesses and the security measures taken to restrict access to their computer database of credit files. Each testified Gentry was not authorized "to access"[2] their files. They explained that an inquiry about a person who had no prior listing with their subscribing companies would result in the creation of a "file" for that person.[3] They also identified certain documents, products of their respective "data banks," which resulted from just such an inquiry about two names, "Dolores Manchester" and "Diane Wolfe."

Gloria D. Manchester testified she contacted Gentry in 1987 to assist her with improving her credit rating and gave him her Social Security number.

Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data. [¶] (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network. [¶] (3) Knowingly and without permission uses or causes to be used computer services. [¶] (4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. . . ."

[2]Penal Code section 502 codifies the infinitive, "to access," even though "access" is only a noun. (Webster's New Internat. Dict. (3d ed. 1986) p. 11.) Used in the form of a verb, it is manipulated in the way the military and bureaucracies tend to communicate with one another: in a language all of their own.

[3]We do not address the potential liability to innocent third parties who might be harmed by this feature of the software program. Although Gentry found a weakness in the program and exploited it, responsibility should not rest solely with the felon. Credit reporting companies should recognize this flaw is needlessly risky and remedy it.

She wanted a business loan but her credit history was "very negative." She was not sure what, if anything, could be done, but she did want to ascertain whether *something* could be done to improve her credit rating. She had heard Gentry speak at a business club luncheon on improving credit records and decided to contact him. Gentry took her to lunch where he told her he could "clean up" her credit report. She did not understand the process and he did not explain it. He simply told her he had many different ways to improve her credit rating. She paid him about $1,000.

At their next meeting, Gentry gave her some credit applications and detailed instructions on how to apply for certain credit opportunities. He told her, in essence, to commit fraud: to state she had been married to a recently deceased man; to say her name was Dolores G. Manchester instead of Gloria D. Manchester; and to assert a Social Security number that differed from her own by one digit. He also instructed her to tell the Department of Motor Vehicles that she had lost her driver's license, and wanted a replacement in her "correct" name of Dolores G. Manchester.

Along with the credit applications, he gave her some documents which he said were new, clean credit reports from Trans Union, CBI and TRW under the name "Dolores Manchester." Each report reflected no credit history and made no reference to the bankruptcy and collection problems listed on her true credit report.

Manchester was quite upset by these instructions and refused to comply with them. She had never given Gentry permission to enter information into these data bureaus and particularly not false information. She put the whole package in a drawer and never used it, even though she had paid him a fee of nearly $1,000.

As Manchester was brooding over the materials in her drawer, a "sting" operation was in progress to net the unwary Gentry. Detective Stockwell of the Anaheim Police Department contacted Diane Terry, the consumer relations manager of Trans Union. She agreed to participate in a computer access investigation. Diane Terry became Diane Wolfe. Her role, after creating a fictitious file in the Trans Union credit data bank on Diane T. Wolfe, was to telephone "National Credit Service" which advertised itself as a service for people with credit problems. She represented herself to be Diane Wolfe and spoke with Gentry who assured her he could clear up her credit record and create a new credit file for her. When she asked how he would do this, he told her he would create a new identity for her and asked for $24 to obtain copies of her TRW and CBI credit reports.

She eventually met with Gentry at his home in Anaheim Hills where he told her it would cost $1,000 to create a new credit file: $500 up front, and

the balance later. She asked him to meet with her "boyfriend" who would take care of the details. She later introduced him to Detective Stockwell who masqueraded as her boyfriend, Richard Stearns.

Stockwell, as Stearns, asked Gentry what he would do to assist his "girlfriend" if she paid him the $1,000. Gentry told him he could create a new identity for her by making her appear to be her "twin" after which she could apply for credit under the new identity. He emphasized she would have to fill out the credit applications herself but he would provide the information. He also gave Stockwell a credit report on Diane Wolfe from Trans Union.

Diane Terry then checked the Trans Union files and discovered someone had inquired about Diane T. Wolfe and also about Dolores Manchester. Terry later testified Gentry was not authorized to gain access to Trans Union files. No one besides Terry, Stockwell and Gentry were aware of the name Diane T. Wolfe. The net had dropped on Gentry.

Besides the sting operation, a proverbial "snitch" was also involved. Upon this stage entered Marlon Steverson, a novice in the field of fraudulent schemes. Steverson met with George Panteras of Marathon Financial Services in March 1988. Steverson had known Panteras for about five years and hoped Panteras could help him obtain a loan of several thousand dollars. He could not qualify for it himself because of his poor credit background. Panteras told Steverson to get a new identity, preferably from a recently deceased person with "A-1" credit. He told him Gentry could procure a new driver's license and social security card for him for about $1,200. After obtaining this new identification, Steverson could apply for loans and credit cards. Panteras's fee would be 50 percent of the large loan. He suggested Steverson "milk" his new credit identity for as much as possible. Steverson then returned to Panteras's office where he met Gentry. Gentry took his picture. But, alas, before our bumbling "con-man" could return for these documents, he was arrested while helping another cohort cash a forged check in a scam unrelated to the facts of this case. Prudently, he experienced a twinge of conscience and decided to work with the police. He returned to Panteras's office in the company of an undercover officer. Panteras gave him a new driver's license, Social Security card and check guarantee card in the name of Peter J. Hixon. When they left, Steverson gave them to the undercover officer.

On January 29, 1988, Detective Stockwell searched Gentry's home pursuant to a warrant. He found a computer terminal, files and credit reports under the name of Diane Wolfe and a driver's license under the name of Leo W. Sailer bearing a photograph of Gentry. An obituary for Sailer was also found,

taped to a credit report for the same person. Gentry was no longer in business.

## DISCUSSION

### *Sufficiency of evidence for grand theft.*

■ Gentry was convicted of grand theft for taking $980 from Manchester. He contends the evidence was insufficient as a matter of law to support the conviction.

■ The standard of review for sufficiency of the evidence has been repeatedly stated. " '[T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People* v. *Towler* (1982) 31 Cal.3d 105, 117 [181 Cal.Rptr. 391, 641 P.2d 1253], original italics.) We examine the record in a light most favorable to the prosecution to determine if any trier of fact could rationally find the elements of grand theft.

■ "Grand theft by false pretenses 'consists of three elements: (1) the making of a false pretense or representation by the defendant, (2) the intent to defraud the owner of his property, and (3) actual reliance by the owner upon the false pretense in parting with his property.' [Citation.]" (*People* v. *Jackson* (1987) 193 Cal.App.3d 393, 401 [238 Cal.Rptr. 327].) Moreover, the false pretense must be corroborated whenever it was not made in writing (Pen. Code, § 532, subd. (b) [formerly Pen. Code, § 1110]; see *People* v. *Randono* (1973) 32 Cal.App.3d 164, 173 [108 Cal.Rptr. 326]), but it need not be an express statement; it can be implied from statements in conjunction with conduct intended to deceive. (*People* v. *Smith* (1984) 155 Cal.App.3d 1103, 1146-1147 [203 Cal.Rptr. 196].) ■ " 'It is well established that criminal intent may be inferred from the general circumstances surrounding the transactions, and that other similar transactions carried on by a defendant are sufficient to prove guilty knowledge and criminal intent.' [Citations.]" (*Id.* at p. 1148.)

■ Gentry argues he made no false representation to Manchester; she gave him $980 and he gave her assistance in "clearing up her credit." She received the benefit of her bargain and only disapproved of Gentry's assistance *after* he had given it. Manchester testified, however, she went to Gentry for help to clear up her credit so she could get a loan. She told him she did not know how financial information was compiled, maintained or

distributed but she knew she needed help. He told her he could provide it. The *implication* was that he could do so *legally*.

█ To support a conviction for grand theft by false pretense, the accused must have made a misrepresentation upon which the victim relied, but the misrepresentation need not be explicitly made. An *implied* false pretense is sufficient. (*People* v. *Smith, supra,* 155 Cal.App.3d at pp. 1146-1147.) █ Manchester presumed Gentry's service was a legal one and would not have paid him the $980 had she known the truth. Her presumption was reasonable because parties to a contract are presumed to intend a lawful execution of their promises. (*Redke* v. *Silvertrust* (1971) 6 Cal.3d 94, 102 [98 Cal.Rptr. 293, 490 P.2d 805] [without evidence to the contrary, a dying wife's agreement not to change her will if her husband would respect her wishes in the distribution of her separate property, was not made with the intention of defrauding the tax authorities].)

Gentry argues this implied pretense has not been proven by two or more witnesses, or one witness and other corroboration as required by Penal Code section 532, subdivision (b) (formerly Pen. Code, § 1110).[4] We disagree. Manchester was not the only witness who testified to Gentry's initial statements to persons in desperate financial straits; Terry, disguising herself as Wolfe, received the same advice for the same price from Gentry. █ The multiple witnesses required under Penal Code section 532, subdivision (b), need not testify to the same instance of pretense. When more than one witness testifies to a defendant's false pretenses, even though made on separate occasions, the multiple witness requirement is met as long as the same type of scheme is involved and the same manner is employed. (*People* v. *Keefer* (1973) 35 Cal.App.3d 156, 161-162 [110 Cal.Rptr. 597] [three homeowners said a con artist examined each of their furnaces, telling them the furnaces required immediate replacement when, in fact, they did not]; see also CALJIC No. 14.18 (5th ed. 1988).)

█ Additionally, Manchester's testimony was corroborated by the existence of new credit reports Gentry gave her under a new identity. These

---

[4]Penal Code section 532, subdivision (b), states, "Upon a trial for having, with an intent to cheat or defraud another designedly, by any false pretense, . . . or having obtained from any person any labor, money, or property, . . . the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof is in writing, . . . or unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances. . . ." Penal Code former section 1110 stated, "Upon a trial for having, with an intent to cheat or defraud another designedly, by any false pretense, . . . or having obtained from any person any labor, money, or property, . . . the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof is in writing, . . . or unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances; . . ."

documents corroborate the pretense when viewed in the context of their agreement. Gentry had agreed to assist in improving her credit position in exchange for $980. These phony reports demonstrate he did not intend to perform this promise in a legal manner. (See *People* v. *Causey* (1963) 220 Cal.App.2d 641, 656 [34 Cal.Rptr. 43] [escrow instructions in furtherance of a real estate sale to a "dummy" individual with the intention of obtaining jewels as collateral for a future property purchase were sufficient corroboration to satisfy Pen. Code, § 1110].) The evidence was sufficient to support the conviction.

### Sufficiency of evidence of illegal computer access.

Gentry was convicted of "intentionally [gaining access to a] . . . computer system . . . for the purpose of (1) devising or executing [a] scheme or artifice to defraud . . . or (2) obtaining . . . services with false or fraudulent intent, . . ." (Pen. Code, § 502, subd. (b) [as it read in 1987].) ■ Gentry contends the prosecution failed to prove any intention on his part to defraud. Relying on federal statutes and cases interpreting federal mail fraud, he argues he cannot be convicted in state court on a different definition of fraud. The argument hardly merits comment.

Relying on Civil Code sections 1572,[5] 1709,[6] and 1710,[7] CALJIC No. 15.26 defines "intent to defraud" as "an intent to deceive another person for the purpose of gaining some material advantage over that person or to induce that person to part with property or to alter that person's position to [his][her][its] injury or risk, and to accomplish that purpose by some false statement, false representation of fact, wrongful concealment or suppression of truth, or by any other artifice or act designed to deceive." Here, Gentry gained access to the confidential files of TRW, CBI, and Trans Union without their permission or knowledge. ■ ■ ■ ■ Upon gaining

---

[5]Civil Code section 1572 states, "Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"5. Any other act fitted to deceive."

[6]Civil Code section 1709 states, "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

[7]Civil Code section 1710 states, "A deceit, within the meaning of the last section, is either: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; [¶] 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or [¶] 4. A promise, made without any intention of performing it."

access, he deliberately entered false information, such as the false names and numbers, which he knew would result in the subscribers to these companies' services extending credit to individuals they would otherwise refuse. Gentry's scheme was exactly the kind of manipulation of computer data files the statute was designed to prohibit.[8]

Gentry also complains the statute requires evidence he obtained money or services as a result of gaining access to these computer systems by false pretense. He contends the evidence proved only that he gained access to the system without permission, not by a false pretense. The record contradicts him. The Trans Union documents on Diane Wolfe were altered by a subscriber service company by the name of Data Rentals. Although Gentry was not employed by Data Rentals, he gave a copy of this report to "Stearns." He could only have obtained it by misrepresenting himself as someone working for Data Rentals when accessing the Trans Union network. This was sufficient to show he obtained credit information under false pretenses.

*The unlawful use or manufacture of a driver's license.*

■ Gentry was charged with two felony counts of forging a driver's license (Pen. Code, § 470a)[9] involving the names Peter Hixon and Leo W. Sailer. He was acquitted, but the trial court then stated, "Count 46 I will find him guilty of a lesser *related* of 14601 [*sic*] and find him not guilty of count 47. Not guilty on 47, lesser *related* on 46 of 14601 [*sic*], giving him the benefit of the doubt there. They are a little bit troublesome." (Italics added.)

As Gentry correctly contends, his conviction for a lesser related offense without his express consent must be reversed. (*People* v. *Lohbauer* (1981) 29 Cal.3d 364, 367 [173 Cal.Rptr. 453, 627 P.2d 183].) Further discussion of the other arguments on this point is unnecessary. The court found him guilty of the lesser related offense without his consent and, unlike the Congressional Record, the trial record cannot now be changed nunc pro tunc.

[8]One of the legislative purposes of Penal Code section 502 was "to deter and punish . . . browsers and hackers—outsiders who break into a computer system to obtain or alter the information contained there. . . ." (*Mahru* v. *Superior Court* (1987) 191 Cal.App.3d 545, 549 [237 Cal.Rptr. 298].) This need for " 'sanctions against unauthorized intrusions into computer systems' " was due to an " 'increase in the incidence of misuse and intrusions by unauthorized individuals . . . .' " (*Id.* at p. 549, quoting from a legislative declaration of findings and purpose accompanying a 1984 amendment to § 502.)

[9]Penal Code section 470a states, "Every person who alters, falsifies, forges, duplicates or in any manner reproduces or counterfeits any driver's license or identification card issued by a governmental agency with the intent that such driver's license or identification card be used to facilitate the commission of any forgery, is punishable by imprisonment in the state prison, or by imprisonment in the county jail for not more than one year."

*The amendment to Penal Code section 502.*

■ Gentry engaged in the conduct resulting in his conviction for Penal Code section 502, subdivision (b), on or about December 30, 1987. Effective on January 1, 1988, Penal Code section 502 was substantially amended. Gentry contends he is now entitled to a reversal of his conviction because of the amendment.

Penal Code section 502, subdivision (c), as amended effective January 1, 1988 (see fn. 1, *ante*), did not decriminalize the conduct previously illegal under the earlier version of Penal Code section 502, subdivision (b). Gentry focuses on the changes to subdivision (c). However, the applicable provision is the statute under which he was convicted—subdivision (b). More importantly, the amended statute specifically provides, in subdivision (g): "This section applies only to public offenses committed on or after January 1, 1988. It is the intent of the Legislature that this section be given *no* retroactive effect and persons who commit a violation of the provisions of Section 502 in effect prior to January 1, 1988, shall be held responsible therefor." (Italics added.)

*Absent a savings clause* in the amendment, a criminal defendant is entitled to the benefit of a change in the law which occurs prior to the finality of his judgment. (*People* v. *Babylon* (1985) 39 Cal.3d 719, 722 [216 Cal.Rptr. 123, 702 P.2d 205].) But here there *was* a savings clause in the amending legislation. Penal Code section 502, subdivision (b), in its form prior to January 1, 1988, applies to Gentry.

### DISPOSITION

The conviction of Vehicle Code section 14610 as a lesser related offense of Penal Code section 470a is reversed. In all other respects, the judgment is affirmed.

Sonenshine, J., and Wallin, J., concurred.

A petition for a rehearing was denied October 15, 1991, and appellant's petition for review by the Supreme Court was denied January 8, 1992.