Filed 8/26/20  P. v. Montanez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b) . This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B292730 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA439509) |
| v. | |
| PAUL MONTANEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge. Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Paul Montanez (defendant) went to the home of Norman Benavides (Benavides) with two acquaintances, Miguel Marquez (Marquez) and Aaron Gallardo (Gallardo)—ostensibly to buy marijuana from Benavides. That, however, is not what happened. Montanez beat Benavides, Gallardo shot him, the three confederates stole the marijuana, and Benavides later died from his injuries. Defendant was charged with premeditated murder and with burglary, and a jury convicted defendant on both charges. In this appeal from the judgment, the principal issue we are asked to decide is whether the trial court should have suppressed a recorded post-*Miranda*[1] stationhouse interaction between defendant and Yvonne Islas (Islas), who is Marquez's mother and was defendant's girlfriend at the time.

## I. BACKGROUND

*A.The Offense Conduct*

At the time of the offense conduct, defendant (a member of the Largo criminal street gang) was in a relationship with Islas. Marquez, also known as "Lerks," is Islas's son and knew defendant through her. Gallardo was a friend of Marquez's (both were members of the Kansas street gang). Marquez knew Benavides because he bought marijuana from him in the past.

On February 4, 2014, defendant asked Marquez to contact Benavides and see if he would sell defendant marijuana. Starting at around 7:42 a.m., Marquez exchanged a series of text messages with Benavides, and Benavides agreed to sell defendant a pound of marijuana.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Defendant, Marquez, and Gallardo drove to Benavides's apartment and Marquez introduced defendant to Benavides. As the ensuing events were later described by Marquez at defendant's criminal trial, Marquez walked to the bathroom and heard Benavides ask defendant to help him with something. Marquez saw Benavides and defendant go to the dining room while Gallardo sat on a couch nearby. While inside the bathroom, Marquez heard something that sounded like a scuffle. When he came out of bathroom, he saw Gallardo standing and pointing a gun into the dining room. Marquez asked Gallardo what was going on, looked into the dining room, and saw defendant holding Benavides in a chokehold. Both defendant and Benavides were struggling.

Benavides's roommate, Jay Alvarado (Alvarado) was in his room when the fighting started. He heard rumbling and banging noises and exited his room. Alvarado saw one man standing by the kitchen (Gallardo), another who had zip ties in his hand, and Benavides on the floor getting hit by a third man (defendant) who was on top of him. Gallardo had a gun in his hand, pointed it at Alvarado, and asked Alvarado who he was. Marquez told Alvarado to get back, and Alvarado ran back to his room and shut and locked the door.

Back inside his room, Alvarado continued to hear sounds of a struggle and, ultimately, gunshots. When the noises stopped, Alvarado left his room and found Benavides lying on the kitchen floor and gasping for air. By that time, defendant, Marquez, and Gallardo (holding a black bag) had fled in the same vehicle they had taken to Benavides's apartment. Alvarado called 911.

At defendant's direction, Marquez drove everyone to his brother Roy's house. When they arrived, defendant took the

black bag that Gallardo had been carrying into Roy's house and all four men gathered outside. According to Marquez, defendant told Roy it "went all bad." Roy told the three men to get rid of their clothes.

Later that night, Marquez and Gallardo went to pick up a pizza at Pizza Hut. Earlier, Marquez, Gallardo, and defendant had put the clothes they were wearing during the attack on Benavides in a bag, and Gallardo threw the bag in a dumpster near the Pizza Hut.

> B.  Police Investigation, Including Defendant's Confession and His Stationhouse Interaction with Islas

Police and paramedics responded to Benavides's apartment shortly after the attack. Benavides was lying face up on the kitchen floor, bleeding from his head. He was unresponsive and having difficulty breathing. There were strangulation marks around his neck, puncture wounds on his chest, a laceration on the bridge of his nose, and gunshot wounds to his abdomen and left leg. The paramedics transported Benavides to a hospital and he underwent surgery. He initially recovered enough to be discharged, but his injuries caused lasting damage and, ultimately, his death.

During an investigation of the crimes against Benavides, the police found text messages on Benavides's phone from "Lerks," which led them to Marquez and Gallardo. When the police detained Marquez, he told them defendant had also been at Benavides's apartment. All three men—defendant, Marquez, and Gallardo—were arrested.

4

After defendant's arrest, and without prompting, he told Detective Ray Camuy that he (defendant) was not going to answer any questions. Detective Camuy advised defendant of his *Miranda* rights using a police department form. When Detective Camuy finished, defendant again said he would not answer any questions, wrote "refused" and "no comment" on the *Miranda* form, and signed the form when asked to do so.

Later that afternoon, however, Detective Camuy received a phone call from his supervisor who told him defendant now wanted to talk. The next morning, Detective Camuy went back to the police station and met with defendant. Defendant told the detective he wanted to "work something out" and make a deal. Detective Camuy re-read defendant his *Miranda* rights before proceeding, and defendant confirmed he understood he had a right to remain silent and to have an attorney present during any questioning.

The immediately ensuing conversation between defendant and Detective Camuy was not recorded.[2] Defendant generally described for the detective the type of information he could provide about others engaged in narcotics trafficking. Detective Camuy listened and responded he was not interested in the information. Defendant then "switched gears" and said he was willing to testify Gallardo was the one who shot Benavides in exchange for a five-year sentence. Defendant told Detective Camuy that the plan was to rob Benavides of the marijuana, not

_____

[2]    Officer Camuy did not initially place defendant in an interview room equipped for recording because defendant said he was interested in providing information on drug dealers and the police do not record conversations with prospective informants.

to kill him. Defendant admitted he kicked Benavides during the altercation (he claimed it was after Benavides had been shot) and he also told the detective he picked up a broken knife handle off the floor at Benavides's apartment (to keep law enforcement from finding it, he said). At that point, believing the conversation was "getting hot," Officer Camuy moved defendant to an interview room with recording capabilities.

Once in the new room, defendant's willingness to continue talking about the Benavides crimes changed and he became more reticent. But he continued to make several incriminating statements. Defendant told Detective Camuy that "what happened, it wasn't supposed to fucking happen" but he "made a mistake and it's a fucked-up mistake" and he was now "going to live with the consequences." Defendant asked the detective why he had been charged with "an attempted murder when he actually didn't" (i.e., when he was not the shooter). The detective responded, "You know how it goes man. If somebody goes in a liquor store, three of you go in a liquor store—" and defendant finished his sentence, "Yeah, all of us get charged with the same shit." There was also this exchange between defendant and the detective:

> [Detective Camuy]: You know I could see, I could see how this shit went down, bro. I mean you of all people wouldn't risk—unless you're a . . . bad, bad criminal, you know what I mean, but I—were you just going to go there and shoot this dude or have this guy killed for five pounds of weed or whatever.
>
> [Defendant]:    Exactly.
> [Detective]:    You know what I mean?
> [Defendant]:    What the fuck?

[Detective]: The shit went sideways quick.

[Defendant]: Come on, five pounds I can go fucking buy it from somebody else. What the fuck I need to steal that?"[3]

Also during the recorded portion of the conversation, Detective Camuy told defendant that Islas wanted to see him and was on her way to the police station. The detective told defendant Islas would "most likely" talk to her son Marquez first, and defendant agreed that was what she should do. Detective Camuy also warned defendant that any interaction between him and Islas would be recorded, but defendant said he wanted to see Islas regardless. As defendant put it, "That's fine. You can monitor all you want. I'm not going to say one single thing about the case. I just want to make sure she's alright."

Before speaking to defendant, Islas spoke with one or two Montebello police officers. She also spent some time waiting in a room with Gallardo's mother, girlfriend, and child. The record also indicates Islas spoke to Marquez by phone before she spoke to defendant, but it is unclear whether Marquez and Islas met in person before she spoke to defendant.

When Islas was brought in to meet with defendant at the police station, she was upset and emotional. She asked defendant a series of questions, including what happened, why he was with Marquez, if he knew how what he had done hurt her, and (perhaps rhetorically) what he had been thinking. One of the

---

[3] Just after this exchange, defendant told Detective Camuy that "none of this shit is on record." The detective responded, "We're just men talking, okay."

7

responses defendant gave was expressly incriminatory: When Islas asked, "Why did you take [Marquez] with you? Why would you do things like that with [Marquez]?," defendant responded, "I went with him." The rest of defendant's responses to Islas's questions and statements, however, were at most implicitly incriminatory; he repeatedly told Islas he couldn't talk about "it" or asked her to be quiet and "say nothing."[4] Some of Islas's questions and interjections were framed in terms of an unspecified "they" who told her defendant was "washing [his] hands on this . . . . [a]nd . . . trying to throw everything on [Marquez]" or wanted to "give him [Marquez] life." Defendant's only response was to ask Islas to name who she was referring to, but she did not answer.

After conversing with defendant, Islas spoke to Officer Julio Calleros and answered questions regarding the conversation. Officer Calleros wanted to know what defendant had been whispering such that what was said was not audible on the recording.

### C. Pretrial Proceedings

In an amended information, the Los Angeles County District Attorney charged defendant (and Marquez and Gallardo) with murder and first degree residential burglary. Accompanying the murder charge were gang, use of a firearm, and Three Strikes law allegations.

---

[4] At various points in the conversation, defendant leaned close to Islas and talked into her ear. Those portions of the conversation were inaudible on the recording.

8

Before trial, defendant filed two motions to suppress his conversation with Islas. One was styled a "Motion in Limine to Exclude Defendant Montanez's Taped Conversation with Ms. Islas that Occurred While Montanez was in Custody After He Had Invoked His Miranda Rights" and the other was styled a "Motion in Limine to Suppress Defendant's Statements to Police and a Taped Conversation Between Montanez and a Police Agent." As relevant for our purposes, the motions argued Islas had acted as a police agent, Islas had been allowed to interrogate defendant after he invoked his *Miranda* rights, and defendant's statements to Islas were coerced and involuntary. Islas, Officer Calleros, and two other officers testified in connection with the motions.

### 1.     *Officer Calleros's testimony*

Officer Calleros spoke to Islas once she arrived at the police station and she said she wanted to talk to Marquez and defendant. When asked if he told Islas that defendant had invoked his right to remain silent, Officer Calleros said he "kept [his] information to her very limited. [He] didn't give her any specifics about the case. It was—it was a visitation. She didn't need to know what position [defendant] had taken." Officer Calleros specifically denied telling Islas that defendant had "washed his hands of this incident." Officer Calleros also did not ask Islas to obtain information from defendant on behalf of the police department, nor did he tell her obtaining information might benefit Marquez's case. The visit between Islas and defendant came about, as Officer Calleros explained it, because "[s]he wanted to visit, he wanted to visit, so we allowed them to visit."

9

Officer Calleros also had a three-minute conversation with Islas after she visited with defendant.[5] Officer Calleros asked her several questions about whether defendant told her how everything happened, the role of his co-defendants, and what was done with the marijuana.

### 2. *Islas's testimony*

After arriving at the police station at the request of the police, Islas waited in a room with Gallardo's mother, girlfriend, and child. Islas was later called into a room with two detectives (she could not recall their names) who asked her if she knew what was happening. When she said no, they told her defendant and Marquez were in custody because someone had been hurt, but they did not tell her anything else about the case.

Islas told the detectives she wanted to speak to defendant and Marquez. She wanted to speak to defendant, in particular, because she wanted to know what happened and to get an explanation of how he had gotten into trouble with Marquez. The detectives did not ask her to speak to defendant or Marquez, they did not suggest she try to elicit any information from either of them, they did not tell her Marquez was facing life in prison, and they did not make any kind of agreement that would have helped her or Marquez if she obtained information from defendant.

_____

[5] At a prior hearing, Officer Calleros was asked if, in speaking to Islas, he intended to see if she developed any information that could be used in the case. He answered no. He was then asked if he intended to find out whether or not there was any conversation about a gun, or any statement by defendant about a gun. Officer Calleros responded that was "correct."

10

### 3. *The trial court's ruling*

In addition to the testimony from Officer Calleros and Islas, the trial court received and reviewed the transcript of the recorded conversation between defendant and Detective Camuy and a transcript of a prior hearing before a different judge (who had determined Islas had not been an agent of the police). The court denied the defense suppression motion, concluding there was no violation of *Miranda*. The court found that "[t]here was clearly a re-initiation of discussions by . . . defendant"; that there had been no showing defendant's statements were involuntary; and that, while the police had taken advantage of "what [Islas] did" by recording her interaction with defendant, the facts did not indicate Islas was acting as an agent of the police.

### D. *Trial, Verdict, and Sentencing*

More than 30 witnesses testified at defendant's trial. Marquez testified against defendant as a witness for the prosecution, and Detective Camuy testified and recounted the incriminatory statements defendant made before the recorded portion of their conversation. The prosecution also played for the jury various video and audio recordings, including the recorded portion of the conversation between Detective Camuy and defendant as well as the recording of the interaction between Islas and defendant (that the court admitted after denying the motion to suppress).

In addition, the prosecution presented forensic evidence to show defendant had participated in the assault on Benavides—chiefly in the form of criminalist testimony regarding the bag of clothes Gallardo dumped near the Pizza Hut. The jury learned

11

blood had been found on boots defendant was wearing, defendant's DNA and Benavides's blood was found on a white sock, and blood from both defendant and Benavides was found on a tan shirt defendant was wearing on the day of the shooting. Three witnesses testified during a short defense case, including an expert who opined that if the blood was still wet on some of the items found in the bag thrown in the Pizza Hut dumpster, there could have been secondary transfer of some of the DNA material.

The jury was instructed on various theories of murder, including felony murder and murder on a natural and probable consequences theory. The jury convicted defendant of first degree murder, with special circumstance true findings, and burglary.[6] The trial court sentenced defendant to life without the possibility of parole on the murder count and ordered the burglary conviction sentence stayed pursuant to Penal Code section 654.[7] The court ordered defendant to pay a $300 restitution fine, a $40 court operations assessment on each count of conviction, and a $30 court facilities assessment on each count.

## II. DISCUSSION

All three arguments defendant advances to avoid affirmance of the judgment are unpersuasive. Defendant argues

---

[6] The jury found not true the allegation that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members.

[7] Undesignated statutory references that follow are to the Penal Code.

12

the recorded stationhouse interaction with Islas should not have been received in evidence at trial because Islas was an agent of the police who interrogated defendant after he invoked his right to remain silent. It is undisputed, however, that defendant reinitiated contact with Detective Camuy after his earlier invocation, and it is also undisputed that defendant asked to meet with Islas even after being warned the police would monitor their interaction. We believe these circumstances establish an implied waiver of the right to remain silent that continued throughout at least part of the Islas interaction, and regardless, we are confident the Islas recording did not contribute to the verdict obtained in light of the strong evidence against defendant—including other damaging recorded statements he made that he did not seek to suppress. Defendant contends he should be eligible for Senate Bill 1437 relief without following the retroactive relief provision enacted as part of that legislation, but we adhere to our holding in *People v. Martinez* (2019) 31 Cal.App.5th 719 (*Martinez*) and agree with later decisions that followed *Martinez*: defendant can seek to avail himself of the ameliorative benefits of Senate Bill 1437 only by filing a section 1170.95 petition in the trial court. Defendant finally argues *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) requires reversal of his monetary fine and assessments because the trial court did not consider his ability to pay, but we hold the absence of any consideration of an ability to pay the minimal financial obligations is harmless in light of the life without parole sentence imposed and defendant's ability to earn wages in prison.

13

*A.    The Trial Court's Suppression Ruling Provides No
Grounds for Reversal*

Defendant contends Islas was an agent of the police, the statements he made in his recorded conversation with her were the product of an improper police interrogation conducted after he invoked his *Miranda* rights, and the admission of the statements was therefore error. His opening brief, however, never acknowledges he expressed a desire to talk with the police after first invoking his right to remain silent, nor does it reveal Detective Camuy re-advised defendant he had a right to remain silent and to consult with an attorney before restarting the conversation as defendant had requested.

An invocation of the right to remain silent is not an irreversible action. Rather, well-settled law allows a defendant who previously invoked his or her Fifth Amendment rights to rescind that invocation and restart discussions with the authorities. Importantly, however, for statements made by a defendant in such a scenario to be admissible at trial, the record must show that any further communications occurred at the behest of the defendant—not the police—and that the defendant waived the previously invoked right to remain silent. (*People v. Jackson* (2016) 1 Cal.5th 269, 336-341.)

That is what we have here, largely on undisputed facts. Defendant first refused to speak with Detective Camuy but later reestablished contact by telling the detective's supervisor (or some other officer who conveyed the information to the detective's supervisor) that he wanted to talk to Detective Camuy. When the two were again face to face, Detective Camuy re-read defendant his *Miranda* rights off a department-issued card (i.e., he again advised defendant had a right to remain silent) and

14

defendant confirmed he understood his rights. This occurred before defendant discussed his desire to "work something out" either as an informant for the police or as a witness against Gallardo in exchange for a five-year sentence, and defendant's willingness to discuss both topics operates as an implied waiver of his right against self-incrimination. (*People v. Cruz* (2008) 44 Cal.4th 636, 667 ["A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights"].)

Defendant never expressed a desire to cease talking after discussions with Detective Camuy resumed. As it pertains to Islas specifically, defendant could have declined to meet with her at all, yet he twice told Detective Camuy he wanted to see Islas even after the detective warned him the meeting would be monitored by the police. To be sure, defendant did tell Detective Camuy that he was not going to talk about the case when he met with Islas, and we acknowledge this presents a closer question of whether there was a selective invocation of his right to remain silent. (See generally *People v. Flores* (2020) 9 Cal.5th 371, 425-426.) But even if there was a selective invocation, that still does not warrant reversal.

There is no question that defendant's incriminating statements to Detective Camuy were properly admitted against defendant at trial. Treating defendant's refusal to answer *some* of Islas's questions as selective invocations of Fifth Amendment rights (we assume, just for argument's sake, that Islas was acting as an agent of the police), defendant did not selectively invoke his right to remain silent when Islas asked why he "took [Marquez] with him" and why he would "do things like that" with

15

Marquez—instead, defendant admitted he was "with him [i.e., Marquez]," which means at least that admission, made voluntarily, was properly used against him at trial.[8] (See *Flores, supra*, 9 Cal.5th at 426 ["Defendant clearly knew how to exercise his right to remain silent selectively but chose to speak about the Jaimes murder"]; see also *People v. DePriest* (2007) 42 Cal.4th 1, 34 [involuntariness is shown when a defendant's free will was overborne].) As for the prosecution's use at trial of other aspects of the monitored recording as evidence of adoptive-type admissions by defendant,[9] we are confident beyond a reasonable doubt that they did not contribute to the verdict obtained even treating them as selective invocations of the right to remain silent. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The jury heard evidence of defendant's unrecorded incriminating admissions to Detective Camuy, those admissions were corroborated and amplified by defendant's incriminating admissions to the detective that were recorded,[10] Marquez provided damaging insider testimony against defendant, and there was strong forensic evidence linking him to the crime. The

---

[8] During closing argument, the prosecutor argued defendant's "statements to . . . Islas . . . show [ ] he was there."

[9] The prosecutor argued during closing: "Why can't [defendant] speak openly and freely [to Islas] if he's so innocent? [¶] Is that what innocent people do, try to continue to lie, try continue covering up the crime? [¶] Why can't he speak openly? Why can't he speak freely?"

[10] Defendant, for instance, said that what happened "wasn't supposed to fucking happen" and he "made a mistake," which meant he was now "going to live with the consequences."

16

evidence of defendant's reticence when speaking to Islas, mentioned only briefly by the prosecutor in closing, was comparatively unimportant.

B.    *Defendant Is Not Entitled to Reversal Under Senate Bill 1437*

The jury returned its guilty verdicts in May 2018. Defendant was sentenced on September 14, 2018. Later that month, the Governor signed Senate Bill 1437, which became effective on January 1, 2019. "Senate Bill 1437 was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability. Senate Bill 1437 also adds . . . section 1170.95 [to the Penal Code], which allows those 'convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . .' (§ 1170.95, subd. (a).)" (*Martinez, supra,* 31 Cal.App.5th at 723.)

In *Martinez,* we considered whether a defendant whose conviction was not yet final when Senate Bill 1437 took effect can seek retroactive relief on direct appeal, or if such a defendant is required to proceed by way of a petition pursuant to section

17

1170.95. (*Martinez, supra*, 31 Cal.App.5th at 724-730.) Relying on our Supreme Court's recent decisions in *People v. Conley* (2016) 63 Cal.4th 646 (*Conley*) (addressing the retroactivity of the Three Strikes Reform Act of 2012) and *People v. DeHoyos* (2018) 4 Cal.5th 594, 600 (addressing the retroactivity of Proposition 47), we held the Legislature did not intend Senate Bill 1437 to apply retroactively to nonfinal convictions on direct appeal outside the petitioning procedure provided by section 1170.95. (*Martinez, supra*, 31 Cal.App.5th at 727.)

Defendant acknowledges the *Martinez* opinion, plus a bevy of cases that follow *Martinez* and reject variants of the argument for retroactive Senate Bill 1437 relief on direct appeal (see, e.g., *People v. Anthony* (2019) 32 Cal.App.5th 1102; *People v. Lopez* (2019) 38 Cal.App.5th 1087; *People v. Munoz* (2019) 39 Cal.App.5th 738), foreclose the arguments he advances. He argues, however, that these opinions are wrongly decided.[11] We remain convinced the *Martinez* line of cases are soundly reasoned, and we reject defendant's arguments to the contrary for the reasons given in those cases. If defendant is to pursue relief from changes in law worked by Senate Bill 1437, he must do so via a section 1170.95 petition, not through this appeal—or his request, which finds no support in precedent (and defendant cites

---

[11] Defendant chiefly relies on two cases decided in the 1970s and 1980s: *People v. Babylon* (1985) 39 Cal.3d 719 and *People v. Rossi* (1976) 18 Cal.3d 295. Both cases involved substantive changes to the elements of the crime for which the defendant was convicted, but neither involved a new or amended law that "modif[ied], limit[ed], or entirely forb[ade] the retroactive application of ameliorative criminal law amendments." (*Conley, supra*, 63 Cal.4th at 656.) They are thus inapposite here.

none), for a remand to the trial court without reversal of the judgment to allow him to file a new trial motion.

### C.     No Change in the Fine and Assessments Imposed by the Trial Court Is Warranted

Relying on *Dueñas, supra*, 30 Cal.App.5th 1157, defendant argues imposition of the court operations assessment, conviction assessment, crime prevention fee, and restitution fine were unconstitutional because the trial court did not consider his ability to pay the financial obligations. Our Supreme Court has granted review to decide whether, as *Dueñas* holds, a court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) Even if the Supreme Court concludes consideration of ability to pay is required, that would not warrant reversal for *Dueñas* reasons here. Any error by the trial court in failing to consider, sua sponte, defendant's ability to pay the fine and assessments about which he complains is harmless in light of the long custodial sentence imposed. (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM, J.